SUPREME COURT OF ARIZONA
en banc

STATE OF ARIZONA,                        ) Arizona Supreme Court
                                         ) No. CR-01-0421-AP
                             Appellee,   )
                                         ) Maricopa County Superior
                      v.                 ) Court
                                         ) No. CR1995-006472
MICHAEL JOE MURDAUGH,                    )
                                         )
                            Appellant.   )   **O P I N I O N**
                                         )
_____  )

Appeal from the Superior Court in Maricopa County
No. CR1995-006472
The Honorable Sherry Hutt, Judge

**AFFIRMED**
_____

Janet A. Napolitano, Former Attorney General              Phoenix
Terry Goddard, Attorney General
     By:  Kent E. Cattani, Chief Counsel
          Capital Litigation Section
     and  Dawn M. Northup, Assistant Attorney General
Attorneys for Appellee

Michael S. Reeves                                         Phoenix
     and
Michael G. Tafoya                                        Phoenix
Attorneys for Appellant
_____

**R Y A N**, Justice

¶1      Michael Joe Murdaugh entered into a plea agreement which resulted in convictions for the kidnapping, robbery, and first degree murder of David Reynolds.  The trial judge sentenced Murdaugh to death for the first degree murder.  Appeal to this court is automatic and direct when the court imposes a

sentence of death. Ariz. Rev. Stat. ("A.R.S.") § 13-703.04 (Supp. 2003); Ariz. R. Crim. P. 26.15, 31.2(b). The court has jurisdiction under Article 6, Section 5(3), of the Arizona Constitution, Arizona Revised Statutes section 13-4031 (2001), and Arizona Rule of Criminal Procedure 31.2(b).

## I.

¶2 On June 26, 1995, Murdaugh's girlfriend, Rebecca Rohrs, met the victim, David Reynolds, at a gas station.[1] Rohrs told Reynolds that she was looking for a job and Reynolds indicated he might be able to help her. Rohrs gave Reynolds a copy of her resumé and the two exchanged phone numbers. At some point in the conversation, Reynolds offered to pay Rohrs for oral sex. Rohrs declined his offer and went home.

¶3 When Rohrs arrived at the home she shared with Murdaugh, she told him what happened at the gas station. Murdaugh decided to teach Reynolds a lesson and instructed Rohrs to contact Reynolds and invite him to the house.

¶4 Rohrs paged Reynolds and invited him to "party" with her and her friend, Betty Gross. Reynolds returned the page and while Rohrs was talking to him, Murdaugh stood nearby and told

---

[1] We view the evidence in a light most favorable to sustaining the verdicts. *State v. Gallegos*, 178 Ariz. 1, 9, 870 P.2d 1097, 1105 (1994) (citing *State v. Atwood,* 171 Ariz. 576, 596, 832 P.2d 593, 613 (1992), *disapproved on other grounds by State v. Nordstrom,* 200 Ariz. 229, 241, ¶ 25, 25 P.3d 717, 729 (2001)).

her what to say.  After the call, Murdaugh and his friend, Jesse Dezarn, left to buy methamphetamine.  They instructed Rohrs and Gross to page them as soon as Reynolds arrived.  Murdaugh also told them to make sure Reynolds did not leave before he and Dezarn returned.

¶5    Approximately fifteen minutes after Reynolds arrived at the house, Murdaugh and Dezarn stormed in brandishing firearms.  Murdaugh began shouting at Reynolds demanding to know why he thought that he could treat Rohrs "like a whore."  Murdaugh continued to yell at Reynolds while Gross and Rohrs left the house to take anything of value out of Reynolds' plumbing van.  Reynolds remained in the house with Dezarn and Murdaugh, both of whom continued to waive firearms.  Murdaugh ordered Reynolds to empty his pockets onto the coffee table.  Reynolds had about $200 in cash.  At some point in the evening Murdaugh took the money.

¶6    Murdaugh came out onto the porch, while Rohrs and Gross were unloading the plumbing van, and reprimanded them for not wearing gloves.  He told them that they had left fingerprints on everything and asked, "Do you know what I am going to have to do now?"  Murdaugh instructed Gross and Rohrs to wipe the equipment clean of fingerprints and to place everything back in Reynolds' van.  Reynolds likely heard the entire exchange.

¶7     While Rohrs and Gross were unloading the van, Murdaugh asked Rohrs to bring him a baseball bat. Rohrs brought the bat into the house and Murdaugh asked her if she would like to take a swing at Reynolds' head. Rohrs declined. Murdaugh also told Gross to take a swing at Reynolds, but she too refused.

¶8     At about 11:30 p.m., after Rohrs, Murdaugh, Dezarn, and Gross ate dinner, Murdaugh led Reynolds to his detached, three bay garage. Dezarn, still armed with a firearm, walked behind Reynolds. Inside the garage, Murdaugh ordered Reynolds into the trunk of his Buick so that he could "figure things out." Throughout the night, Murdaugh, Dezarn, Gross, and Rohrs returned to the garage to take methamphetamine.

¶9     In the early morning hours of the next day, Dezarn and Murdaugh agreed that they needed to get rid of Reynolds' van. They decided to "ditch" it near Whitman Cemetery. Murdaugh led the way in his vehicle while Dezarn followed in Reynolds' van. They abandoned the van on Cemetery Road and began driving back to Murdaugh's house. On the way, they stopped for gas in Whitman and ran into an acquaintance named Ron Jesse. They asked Jesse for drugs, and all three returned to Murdaugh's house. From there, Dezarn and Jesse left to get more methamphetamine with the money Murdaugh took from Reynolds.

¶10     After Dezarn and Jesse returned with the drugs, they and Murdaugh locked themselves in the garage to "shoot up."

While in the garage, Murdaugh told Jesse what happened to Rohrs at the gas station and that he had Reynolds locked in the trunk.

¶11     At about 8:30 a.m., Murdaugh opened the door to the garage and allowed Gross and Rohrs to join him, Dezarn, and Jesse to take more drugs.  Murdaugh opened the trunk to show Jesse that Reynolds was there and Reynolds said that he needed to go to the bathroom.  Murdaugh let Reynolds out of the trunk and took him to the corner of the garage to urinate.  When Reynolds' back was turned, Murdaugh struck him in the head with a nylon meat tenderizer.  After Reynolds fell to the floor, Murdaugh picked up a metal jack hammer spike and continued to hit Reynolds in the face and head.  At some point, either before or during the attack, Murdaugh placed a green nylon bag over Reynolds' head.  The attack caused three major crushing blows to Reynolds' skull resulting in his death.

¶12     After the murder, Murdaugh left Reynolds lying face down in the garage with the bag tied over his head.  He instructed Gross and Rohrs to sprinkle horse manure over Reynolds' body and on the blood surrounding his body.  The body was left in this condition for the remainder of the day.

¶13     At some point after the murder Jesse attempted to leave Murdaugh's home.  Jesse, however, was unable to leave the property because of a locked gate.  While he was waiting for Murdaugh to unlock the gate, Murdaugh approached Jesse and

threatened him.  Murdaugh said that if Jesse told anyone about what happened in the garage, he would "kill [Jesse] last and peel the skin off his children."  After Murdaugh threatened Jesse, he opened the gate and allowed him to leave.

¶14     Around the time of the murder, Murdaugh realized that he and Dezarn had left items in Reynolds' van that would reveal that the van belonged to Reynolds.  Murdaugh told Dezarn and Rohrs to retrieve the items from the van.  Dezarn ultimately retrieved Reynolds' pagers, wallet, and identification papers and returned to Murdaugh's house with Rohrs.

¶15     Later that evening, Murdaugh and Dezarn loaded Reynolds' body into the front right compartment of Murdaugh's horse trailer.  Murdaugh told Rohrs to clean up the blood in the garage.  Murdaugh then packed to go camping and left with his horses and his dog some time after midnight.

¶16     Once at his campsite, Murdaugh dismembered Reynolds' body in an effort to thwart attempts to identify it.  He first cut off Reynolds' head and hands.  He then removed the finger pads from the hands and pulled all Reynolds' teeth.  He threw the teeth and finger pads out the window of his truck as he drove along a forest service road leading to the site where he buried the body.  He placed the head and hands in one shallow grave, and the torso in another.  Murdaugh then returned to his campsite.  From his campsite, Murdaugh placed several calls from

Reynolds' cell phone to Rohrs, both at home and to her pager.

¶17    The police, who had been notified by Reynolds' family of his disappearance, obtained copies of Reynolds' cell phone records.  They discovered that on June 26, Reynolds had made several calls to his company and his girlfriend, and that he had also called Rohrs five times.  Officers contacted Rohrs on June 28, and she told them that she had Reynolds' business card and that she was willing to come to the Sheriff's Office to look at a photograph of Reynolds.  Rohrs never went to the Sheriff's Office to make the identification.  On June 29, the police discovered that Reynolds' cell phone had been used to make four additional calls to Rohrs on June 28.

¶18    Also on June 29, police located Reynolds' van on Cemetery Road.  They found Reynolds' work boots in the van and discovered that his cell phone was missing.  They obtained information from Reynolds' cell phone carrier that the most recent calls from Reynolds' cell phone were originating from the Flagstaff area.  That same day, the police were contacted by a resident of Whitman, Arizona, who told them that a murder had taken place in Murdaugh's garage behind his house.  This individual provided information that led the police to contact Jodi Sheeler, who also had information about the murder.  That afternoon, the police interviewed Ron Jesse, who told them that he had witnessed Reynolds' murder.

¶19     Meanwhile, when Murdaugh called Rohrs, she told him that the police were tracking the calls he made with Reynolds' cell phone.  Murdaugh left his campsite and called Rohrs from a pay phone.  She told him that she had been contacted by the police but that she had not told them anything about Reynolds.  Murdaugh broke Reynolds' cell phone into pieces and disposed of it, along with Reynolds' wallet and papers, near Reynolds' body.  Back at the campsite, Murdaugh was cleaning one of his horse's hooves when his knife slipped and severely cut his leg.  Because he was unable to stop the bleeding, Murdaugh went to nearby Yavapai Regional Medical Center for treatment.

¶20     On June 30, 1995, the police obtained a search warrant for Murdaugh's home and garage.  During the search of the garage, they found the scene as Murdaugh had left it:  there were blood stains on the floor covered with scattered horse manure.

¶21     In the meantime, the Maricopa County Sheriff's Office sent out a teletype notifying other law enforcement agencies that they were looking for Murdaugh.  The Yavapai County Sheriff's Office called the investigators and notified them that Murdaugh was in the emergency room at Yavapai Regional Medical Center.  Investigators asked the Yavapai authorities to impound Murdaugh's vehicle and immediately headed to the medical center to contact Murdaugh.

¶22    When Detective Griffiths of the Maricopa County Sheriff's Office arrived at Yavapai Regional Medical Center, he spoke with hospital personnel and confirmed that Murdaugh had not been given any pain medication.  He then met with Murdaugh at approximately 8:55 p.m. on June 30, and read him the *Miranda*[2] warnings.  Murdaugh agreed to answer questions and then asked whether his garage had been cleaned.  When told that the garage had not been cleaned, Murdaugh said, "Then you have enough to do me in."  He then described Reynolds' murder.  In addition, he provided Detective Griffiths with a detailed map and directions to his campsite.  He also told Detective Griffiths where to find Reynolds' body and personal effects.  With the use of trackers, the police were able to locate the campsite and Reynolds' body without referring to Murdaugh's map.  Reynolds' body was found by the police on July 1, 1995.

¶23    Because Reynolds' murder bore similarities to the murder of Douglas Eggert that had occurred earlier in 1995, detectives asked Murdaugh if he had done anything like the Reynolds' murder before.  Murdaugh admitted that he had also killed Eggert by beating him to death with a meat tenderizer and throwing the body into a canal.

**II.**

¶24    In July 1995, the Maricopa County Grand Jury indicted

---

[2]    *See Miranda v. Arizona*, 384 U.S. 436 (1966).

Murdaugh for the following crimes: Count 1, first degree murder of David Reynolds or, in the alternative, felony murder; Count 2, kidnapping of Reynolds; Count 3, aggravated robbery of Reynolds; and Count 4, aggravated assault of Ron Jesse.

¶25      Later the next year, the Maricopa County Grand Jury indicted Murdaugh for the following crimes: Count 1, kidnapping of Douglas Eggert, and Count 2, first degree murder of Eggert.

¶26      On January 10, 2000, Murdaugh pled guilty to the kidnapping, robbery, and first degree murder of Reynolds. On that same day, he pled guilty to the kidnapping and first degree murder of Eggert. In the latter case, the State and Murdaugh agreed that Murdaugh would receive a life sentence for the murder of Eggert. Murdaugh also acknowledged that his guilty plea to the Eggert murder constituted a conviction for purposes of A.R.S. § 13-703(F)(1) or (F)(2) (Supp. 1995) and would be used as an aggravating factor in the Reynolds case.

¶27      At sentencing, the trial court found that the State proved the following two aggravating circumstances with respect to the Reynolds murder:  1) Murdaugh had been convicted of another offense for which a sentence of life imprisonment or death was imposable, *see id.* § 13-703(F)(1); and 2) Murdaugh committed the murder in an especially heinous, cruel, or depraved manner, *see id.* § 13-703(F)(6) (Supp. 1995). The trial court then found the following eight non-statutory mitigating

circumstances: 1) impairment from the use of crystal methamphetamine at the time of the offense; 2) impairment from chronic drug use; 3) personality disorder; 4) paranoid thoughts; 5) impact of the combination of drug use, personality disorder, and paranoid thoughts on mental abilities; 6) cooperation with law enforcement; 7) lack of prior criminal convictions; and 8) desire to spare his family and the victim's family from trial. The court determined that these mitigating circumstances were not sufficiently substantial to outweigh the aggravating circumstances. Therefore, the court sentenced Murdaugh to death for the first degree murder of Reynolds. The court also sentenced Murdaugh to twenty-one years for the kidnapping of Reynolds and fifteen years for the robbery of Reynolds.

### III.

¶28    Murdaugh raises two issues on appeal: 1) his plea was not knowingly made because "he was not informed that he had a Sixth Amendment right to have a jury determine his sentence;" 2) a jury could determine that the mitigating circumstances in this case are sufficiently substantial to call for leniency.

¶29    In addition, Murdaugh's counsel raised two issues at oral argument that were raised neither in the trial court nor in Murdaugh's brief to this court. Because these issues were raised for the first time at oral argument, they are waived absent fundamental error. *See State v. Bolton*, 182 Ariz. 290,

- 11 -

297, 896 P.2d 830, 837 (1995) ("On appeal we will consider a matter not raised below only if it is a matter of fundamental error."); *State v. Schaaf*, 169 Ariz. 323, 327, 819 P.2d 909, 913 (1991) (finding that because a defendant failed to raise in the trial court either federal or state constitutional claims that his right to speedy trial was violated, the defendant's claims were waived absent fundamental error). An error is fundamental only if it is "of such dimensions that it cannot be said it is possible for a defendant to have had a fair trial." *State v. King*, 158 Ariz. 419, 424, 763 P.2d 239, 244 (1988) (citations omitted). We first address the new issues that Murdaugh raised at oral argument.

## A.

¶30 Murdaugh initially argued that the delay in this case constitutes cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution. In *Lackey v. Texas*, the United States Supreme Court declined to review an analogous claim, namely, that execution of a defendant after he spent many years on death row would constitute cruel and unusual punishment. 514 U.S. 1045, 1045 (1995). With the Court's denial of certiorari, Justice Stevens filed a memorandum noting his belief that this issue should be explored further. *Id.* As a result, many defendants have raised these so-called "*Lackey* claims." *Lackey* claims, however, have found little support in

the courts that have addressed them. *E.g.*, *McKenzie v. Day*, 57 F.3d 1461, 1466-67 (9th Cir. 1995) (finding that delay in carrying out executions benefits inmates, allowing them to extend their lives and perhaps obtain commutations, reversals, or exoneration); *State v. Schackart*, 190 Ariz. 238, 259, 947 P.2d 315, 336 (1997) (rejecting defendant's claim that prolonged incarceration before execution constitutes cruel and unusual punishment).

¶31     Murdaugh presented no authority that the delay in his case, which mostly occurred before sentencing, violates the Eighth Amendment. Moreover, the record shows that Murdaugh did not object to the delay, and in fact stipulated to every continuance of his case. *See Schackart*, 190 Ariz. at 259, 947 P.2d at 336 (noting that the delays in the defendant's case were caused by a variety of circumstances beyond the State's control, including numerous requests for continuances by the defendant).

**B.**

¶32     Murdaugh next argued that he was incompetent to enter a guilty plea. For the following reasons, we do not agree.

¶33     The acceptance of a guilty plea waives the constitutionally protected rights to a jury trial and to confront one's accusers and the privilege against self-incrimination. *Boykin v. Alabama*, 395 U.S. 238, 243 (1969). Accordingly, the trial court must determine whether the plea was

- 13 -

entered voluntarily, knowingly, and intelligently and whether the defendant was competent to enter a plea agreement. Ariz. R. Crim. P. 17.3; *Boykin*, 395 U.S. at 243; *State v. Djerf*, 191 Ariz. 583, 594, ¶ 35, 959 P.2d 1274, 1285 (1998). The court must also determine whether a sufficient factual basis exists to support the plea. Ariz. R. Crim. P. 17.3. A trial court's determination that a defendant is competent to plead guilty will be reviewed for abuse of discretion. *Djerf*, 191 Ariz. at 594, ¶ 35, 959 P.2d at 1285 (citing *State v. Brewer*, 170 Ariz. 486, 495, 826 P.2d 783, 792 (1992)). On review, this court looks for "reasonable evidence" to support the competency determination. *Id.* "Thus, [the court considers] the facts in a light most favorable to sustaining the trial court's finding." *State v. Bishop*, 162 Ariz. 103, 104, 781 P.2d 581, 582 (1989) (citing *State v. Girdler*, 138 Ariz. 482, 488, 675 P.2d 1301, 1307 (1983)).

¶34     In this case, the trial judge found that Murdaugh was competent to plead guilty and that there was a sufficient factual basis to support the plea. The judge questioned Murdaugh directly about his agreement with the State, and Murdaugh responded that he understood both the nature and the consequences of his plea. He also told the judge that he was not under the influence of alcohol at the time of the plea and that the drugs he was taking to control anxiety and back pain

did not impair his ability to understand the plea proceedings. In addition, Murdaugh stated that his attorney had gone over all the terms of the plea agreement with him and that he fully understood the implications of the plea.

¶35    The trial judge did not inquire further into whether Murdaugh was mentally competent to enter the plea agreement. A year before the plea proceedings, however, Drs. Sindelar and Scialli had evaluated Murdaugh's competency to stand trial. Relying on the reports prepared by these doctors, the court had found Murdaugh competent to stand trial. Dr. Potts re-evaluated Murdaugh approximately four months before he entered into his plea agreements. Murdaugh's counsel informed the court that Dr. Potts did not recommend any further competency evaluation. From this we can infer that Dr. Potts found Murdaugh competent to understand the proceedings and assist in his defense. Finally, neither Murdaugh nor his trial counsel raised any claim, either during the change of plea or during the sentencing hearing, that Murdaugh may have been incompetent to plead guilty.

¶36    Viewing this evidence in the light most favorable to sustaining the trial court's decision, reasonable evidence supports the trial court's finding that Murdaugh was competent to enter a plea of guilty and that he entered the plea knowingly, intelligently, and voluntarily.

¶37    Accordingly, we conclude that neither the delay in

Murdaugh's proceedings nor his claim of incompetency to plead guilty rises to the level of fundamental error. Therefore, we deem both claims to be waived. *Bolton*, 182 Ariz. 297, 896 P.2d 837.

¶38    We now address the specific issues Murdaugh raised in his brief. We begin with Murdaugh's claim that his guilty plea was not knowingly made because he was not told that "he had a Sixth Amendment right to have a jury determine his sentence."

### C.

¶39    In 2002, the United States Supreme Court held that Arizona's sentencing scheme, which mandated that a judge decide whether any aggravating factors existed to support the imposition of the death penalty, violated a defendant's Sixth Amendment right to trial by jury. *Ring v. Arizona*, 536 U.S. 584, 609 (2002) ("*Ring II*"). In *Ring II*, the Supreme Court held that "[c]apital defendants, no less than noncapital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id.* at 589.[3]

¶40    Relying by analogy on *Coleman v. McCormick*, 874 F.2d 1280 (9th Cir. 1989) ("*Coleman II*"), Murdaugh argues that his

---

[3]    In response to the *Ring II* decision, the Arizona legislature amended the capital sentencing scheme so that sentencing factors in capital cases are now tried before juries. *See* 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 1.

- 16 -

tactical decision to plead guilty may have been different had he known of his right to be sentenced by a jury. He therefore contends that his guilty plea must be set aside. Murdaugh's argument on this point fails for three reasons.

¶41    First, at the time Murdaugh entered into his plea agreement, there was no Sixth Amendment right to sentencing by jury. *See Ring II*, 536 U.S. at 589. But even if there had been such a right, a jury would have considered the same evidence as did the trial judge in deciding whether to impose the death penalty. Consequently, Murdaugh is unable to show how the subsequent decision by the Supreme Court in *Ring II* affected his tactical decision to plead guilty to first degree murder.

¶42    Second, we find *Coleman* inapposite. In *Coleman*, the defendant was sentenced to death under Montana's mandatory death penalty statute, which provided that upon conviction for certain enumerated crimes the judge must impose a sentence of death. *Coleman II*, 874 F.2d at 1282 & n.1. On direct appeal, the Montana Supreme Court declared this statute unconstitutional and vacated Coleman's death sentence. *State v. Coleman*, 579 P.2d 732, 741-42 (Mont. 1978) ("*Coleman I*"). On remand, Coleman was again sentenced to death, but under Montana's revised death penalty statutes. *Coleman II*, 874 F.2d at 1285. The revised sentencing statutes provided that upon conviction, the trial judge would conduct a separate sentencing hearing at which the

judge would determine whether any aggravating and mitigating circumstances existed. *Id.* If the judge found at least one of the enumerated aggravating factors and found that "there [were] no mitigating circumstances sufficiently substantial to call for leniency," the judge would be required to impose a sentence of death. *Id.* (quoting Mont. Code Ann. § 95-2206.10 (1977) (current version at Mont. Code Ann. § 46-18-305 (2003))).

¶43     Because the mandatory death penalty scheme was in place when Coleman was tried, the Ninth Circuit Court of Appeals reasoned that Coleman's tactical decisions at trial were aimed solely at gaining an acquittal, "without even a hint that evidence in the record would be considered as either mitigating or aggravating factors." *Id.* at 1289. Had Coleman known the trial judge could later consider evidence presented at trial to determine his sentence, he may have made different tactical decisions. *Id.* The court therefore found that "[t]his due process violation had a pervasive effect on the composition of the trial record." *Id.*

¶44     No such due process violation occurred here. *Ring II* impacted only the identity of the trier of fact at sentencing, not the process itself. In addition, at the sentencing hearing, Murdaugh had ample opportunity to present evidence relevant to the sentencing determination. Thus, the change brought about by *Ring II* could not have had any significant impact on Murdaugh's

tactical decision to plead guilty. It therefore does not follow that Murdaugh's guilty plea must be vacated.

¶45        Third, the fact that there was a change in the law subsequent to Murdaugh's guilty plea does not necessarily render his plea involuntary. In *Brady v. United States*, 397 U.S. 742 (1970), the Supreme Court rejected a similar claim made in a habeas proceeding. At the time the defendant in *Brady* pled guilty to kidnapping, he faced a maximum penalty of death. *Id.* at 744. In his petition for writ of habeas corpus, Brady alleged that his plea was involuntary because the death penalty provision of the statute operated to coerce his plea.[4] *Id.* Brady also alleged that his counsel exerted impermissible pressure on him, that he was induced by representations with respect to a reduction of sentence and clemency, and that the trial judge had not fully complied with Rule 11 of the Federal Rules of Criminal Procedure. *Id.* The district court denied Brady's petition, finding that "[Brady's] counsel did not put impermissible pressure on [Brady] to plead guilty and no representations were made with respect to a reduced sentence or clemency." *Id.* at 745. The court also found that Brady decided to plead guilty when he learned his co-defendant had pled guilty and "not by reason of the statute or because of any acts of the

---

[4]    By pleading guilty, Brady avoided a potential death sentence. *Brady*, 397 U.S at 743.

- 19 -

trial judge." *Id.* (internal quotations omitted). The Tenth Circuit Court of Appeals affirmed the denial of Brady's petition, finding that the district court's findings were supported by substantial evidence and concluding that Brady's "plea was voluntarily and knowingly made." *Id.*

¶46 Brady filed a petition for certiorari with the Supreme Court, claiming that because of the Court's decision in *United States v. Jackson*, 390 U.S. 570 (1968), the court of appeals "was in error." *Brady*, 397 U.S. at 745. In *Jackson*, the Court held that the death penalty provision of 18 U.S.C. § 1201(a) — the statute applicable to the charge against Brady — imposed an impermissible burden on a defendant's constitutional right to a jury trial and was therefore unconstitutional. 390 U.S. at 581-83. Notwithstanding the unconstitutionality of 18 U.S.C. § 1201(a), the Court in *Brady* rejected Brady's argument that the statute operated to coerce his plea, noting instead that his guilty plea was likely triggered by the confession of his co-defendant. *Brady*, 397 U.S. at 749. The Court then stated that "even if we assume that Brady would not have pleaded guilty except for the death penalty provision of § 1201(a), this assumption merely identifies the penalty provision as a 'but for' cause of his plea . . . [but] does not necessarily prove that the plea was coerced and invalid as an involuntary act." *Id.* at 750. After considering other factors relevant to the

voluntariness of Brady's plea — representation by counsel, understanding of the charges against him, and competency to plead guilty — the Court held that there is "no requirement in the Constitution that a defendant must be permitted [to withdraw his guilty plea] . . . simply because it later develops . . . that the maximum penalty then assumed applicable has been held inapplicable in subsequent judicial decisions." *Id.* at 757.

¶47    Similarly, nothing in this record indicates that Murdaugh's decision to plead guilty was influenced by whether a judge or a jury would decide if he deserved to be sentenced to death. *Cf. id.* ("[A] voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise."). Thus, Murdaugh's claim here is meritless.

¶48    We therefore turn to Murdaugh's second issue: whether his death sentence must be vacated and his case remanded for resentencing in light of *Ring II*.

**D.**

¶49    In *State v. Ring,* 204 Ariz. 534, 552, 555, ¶¶ 44, 53, 65 P.3d 915, 933, 936 (2003) ("*Ring III*"), this court concluded that it would examine capital sentences imposed under Arizona's superseded sentencing scheme for harmless error. Murdaugh first urges this court to reconsider *Ring III* and find that *Ring II*

error is fundamental and requires automatic reversal of his judge-imposed death sentence. *See State v. Phillips*, 205 Ariz. 145, 149, ¶ 16, 67 P.3d 1228, 1232 (2003) (Jones, C.J., dissenting) ("Where a judge, not a jury, determines all questions pertaining to sentencing, I believe a violation of the Sixth Amendment to the Constitution of the United States has occurred."); *Ring III*, 204 Ariz. at 565, ¶ 105, 65 P.3d at 946 (Feldman, J., dissenting) ("[T]he denial of a jury in the sentencing phase is a defect in the fundamental mechanism of the trial and is therefore structural error."). Murdaugh argues that because a right to an impartial jury is a fundamental right, a denial of jury sentencing is structural error.

¶50 This court has repeatedly rejected similar arguments and held that *Ring II* error is procedural error subject to harmless error analysis. *E.g.*, *State v. Dann*, 206 Ariz. 371, 373, ¶ 5, 79 P.3d 58, 60 (2003); *State v. Montaño*, 206 Ariz. 296, 297, ¶ 3, 77 P.3d 1246, 1247 (2003); *State v. Sansing*, 206 Ariz. 232, 235, ¶ 5, 77 P.3d 30, 33 (2003), *cert. denied*, 124 S. Ct. 2906 (2004); *Ring III*, 204 Ariz. at 552, 555, ¶¶ 44, 53, 65 P.3d at 933, 936; *State v. Towery*, 204 Ariz. 386, 390-91, ¶¶ 12-13, 64 P.3d 828, 832-33 (2003); *accord Schriro v. Summerlin*, 124 S. Ct. 2519, 2523 (2004) (finding that the right to jury sentencing is a procedural, not substantive, right). We thus review Murdaugh's sentencing for harmless error.

¶51    When "a defendant stipulates, confesses or admits to facts sufficient to establish an aggravating circumstance, [the court] will regard that factor as established." *Ring III*, 204 Ariz. at 563, ¶ 93, 65 P.3d at 944.  On the other hand, "when a defendant simply fails to challenge an aggravating circumstance at the penalty phase, the state retains the burden of proving the aggravator's existence beyond a reasonable doubt."  *Id.* at ¶ 94.  The harmless error inquiry, therefore, focuses on whether the state has met its burden.  *Id.*  If the court concludes that the state has not met its burden, the case must be remanded for resentencing.  *Id.*

**1.**

¶52    At the sentencing hearing, Murdaugh did not challenge the State's evidence relating to the following two aggravating circumstances:  1) Murdaugh had been convicted of another offense for which a sentence of life imprisonment or death was imposable, *see* A.R.S. § 13-703(F)(1); and 2) Murdaugh committed the murder in an especially heinous, cruel, or depraved manner, *see id.* § 13-703(F)(6).  And on appeal, he does not contest the trial court's findings relating to these circumstances. Instead, he contends that "[t]his Court cannot conclude, beyond a reasonable doubt, that no jury would determine that the mitigating circumstances (and the others that could have been found) were sufficiently substantial to call for leniency."

Because Murdaugh fails to challenge any of the aggravating circumstances, we focus our inquiry on whether the State met its burden of proving the two aggravating factors beyond a reasonable doubt. *Ring III*, 204 Ariz. at 563, ¶ 94, 65 P.3d at 944.

<strong>a.</strong>

¶**53**    Under Arizona law, there are two aggravating circumstances for prior criminal convictions, A.R.S. § 13-703(F)(1) and (F)(2). Section 13-703(F)(1) applies when "[t]he defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable." Section 13-703(F)(2) applies when "[t]he defendant has been or was previously convicted of a serious offense, whether preparatory or completed." In Murdaugh's case, the trial judge found that the State proved the (F)(1) aggravator beyond a reasonable doubt.

¶**54**    Both the (F)(1) and (F)(2) factors fall outside the *Ring II* rule because they involve a legal determination that may be made by a judge, rather than a factual determination required to be made by a jury. *Ring III*, 204 Ariz. at 558, ¶ 64, 65 P.3d at 939; *see Almendarez-Torres v. United States*, 523 U.S. 224, 226-27 (1998) (finding that a judge can consider prior convictions to enhance a penalty beyond that authorized by the facts established by the jury's verdict). Therefore, this court

will not reverse the trial judge's finding of the (F)(1) aggravator unless there is no reasonable basis for the ruling. *See Phillips*, 205 Ariz. at 147, ¶ 5, 67 P.3d at 1230 (noting that "[i]n *Ring III*, we held 'that the Sixth Amendment does not require a jury to determine prior convictions under sections 13-703[(F)(1)] and [(F)(2)]'" (quoting *Ring III*, 204 Ariz. at 556-57, ¶ 55, 65 P.3d at 936-37)).

¶55 On the same day Murdaugh pled guilty to the first degree murder and kidnapping of Reynolds, he also pled guilty to the first degree murder and kidnapping of Eggert. And, as mentioned above, Murdaugh acknowledged that his conviction for the Eggert murder would be used as an aggravating factor in the Reynolds case under either A.R.S. § 13-703(F)(1) or (F)(2). Consequently, a reasonable basis exists for the trial court's finding that Murdaugh had a prior conviction for an offense in which a sentence of life or death could be imposed. Therefore, no *Ring II* error occurred with respect to the (F)(1) aggravator.

**b.**

¶56 The trial court also found that the murder was committed in an especially heinous, cruel, or depraved manner. *See* A.R.S. § 13-703(F)(6) (providing that the (F)(6) aggravator is established if the court finds that the murder was committed in either an especially heinous, cruel, or depraved manner). Under *Ring II*, determination of the existence of the (F)(6)

aggravator by a judge constitutes reversible error unless this court determines beyond a reasonable doubt that such error is harmless. *State v. Jones*, 205 Ariz. 445, 448, ¶ 10, 72 P.3d 1264, 1267 (2003) (citing *Ring III*, 204 Ariz. at 552-55, ¶¶ 44-53, 65 P.3d at 933-36). "To determine if it was harmless error for a trial judge, instead of a jury, to find an F(6) aggravator, we must find beyond a reasonable doubt that no reasonable jury could have come to a different conclusion than [did] the trial judge." *Id.* (citing *State v. Tucker*, 205 Ariz. 157, 167, ¶ 55, 68 P.3d 110, 120 (2003)).

¶**57**     To establish the existence of the (F)(6) aggravator, the state need prove only one of the heinous, cruel, or depraved elements. *State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983). "Especially cruel" refers to the mental anguish or physical pain suffered by the victim before death. *Sansing*, 206 Ariz. at 235, ¶ 6, 77 P.3d at 33 (citing *State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997)); *Djerf*, 191 Ariz. at 595, ¶ 45, 959 P.2d at 1286. "Heinousness or depravity" refers to the "mental state and attitude of the perpetrator as reflected in his words and actions." *Sansing*, 206 Ariz. at 235, ¶ 6, 77 P.3d at 33 (quoting *State v. Clark*, 126 Ariz. 428, 436, 616 P.2d 888, 896 (1980)).

¶**58**     Because the overwhelming and uncontested evidence establishes beyond a reasonable doubt that Reynolds' murder was

committed in an especially heinous and depraved manner, we need only address those elements. *See Gretzler*, 135 Ariz. at 51, 659 P.2d at 10.

¶59     The term "heinous or depraved" is used to describe the defendant's state of mind. *Sansing*, 206 Ariz. at 237, ¶ 17, 77 P.3d at 35 (citing *State v. Ceja*, 126 Ariz. 35, 39, 612 P.2d 491, 495 (1980)).  The court looks to a defendant's words and actions at or near the time of the offense to determine a defendant's state of mind. *State v. Martinez-Villareal*, 145 Ariz. 441, 451, 702 P.2d 670, 680 (1985).  The term heinous has been defined by this court as "hatefully or shockingly evil: grossly bad." *State v. Knapp*, 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977) (quoting Webster's Third New International Dictionary).  Depraved means "marked by debasement, corruption, perversion or deterioration." *Id.* (quoting Webster's Third New International Dictionary).  To determine whether an act is especially heinous or depraved, the court must consider the following five factors:  1) whether the defendant relished the murder; 2) whether the defendant inflicted gratuitous violence on the victim; 3) whether the defendant needlessly mutilated the victim; 4) the senselessness of the crime; and 5) the helplessness of the victim. *Sansing*, 206 Ariz. at 237, ¶ 17, 77 P.3d at 35 (citing *Gretzler*, 135 Ariz. at 52, 659 P.2d at 11).  Not all of these factors must be present in order to find that a

killing was especially heinous or depraved.  *State v. Medrano*,
173 Ariz. 393, 397-98, 844 P.2d 560, 564-65 (1992).

¶60     The trial court found that the State established
beyond a reasonable doubt that Murdaugh relished the murder, he
mutilated the victim, the murder was senseless, and the victim
was helpless.

¶61     The first factor, that a defendant relishes the
murder, "refers to the defendant's actions or words that show
debasement or perversion."  *State v. Roscoe*, 184 Ariz. 484, 500,
910 P.2d 635, 651 (1996).  To establish relishing, we usually
"require that the defendant say or do something, other than the
commission of the crime itself, to show he savored the murder."
*Id.; accord State v. Doerr*, 193 Ariz. 56, 67-68, ¶ 54, 969 P.2d
1168, 1179-80 (1998) (finding that defendant relished murder
after defendant bragged to his cellmate about playing with the
victim's blood); *State v. Detrick*, 188 Ariz. 57, 68, 932 P.2d
1328, 1339 (1997) (finding that defendant relished murder and
demonstrated an "abhorrent lack of regard for human life" based
on defendant's statement to his co-defendant, "It's dead, but
it's warm.  Do you want a shot at it?"); *State v. Jackson*, 186
Ariz. 20, 30, 918 P.2d 1038, 1048 (1996) (describing how
defendant sang a rap song both immediately after killing his
victim and then after showing a picture of the victim's children
to his co-defendant); *see Clark*, 126 Ariz. at 437, 616 P.2d at

897 (finding depravity when defendant kept a souvenir of his crime).

¶62     The trial court found that the "circumstances and manner of killing" indicate that Murdaugh relished the murder of Reynolds.  The court concluded that Murdaugh reveled in the idea of meting out his own justice and enjoyed the spectacle it created in front of his friends.  The court also found that Murdaugh's decision to place Reynolds in the trunk and keep him captive overnight indicated that Murdaugh enjoyed the emotional toll that waiting had on Reynolds.  We conclude, however, that the record does not contain sufficient evidence that Murdaugh said or did anything, beyond the commission of the crime itself, that manifests that he savored the murder.  Consequently, whether Murdaugh relished the murder was not proven beyond a reasonable doubt.

¶63     Next, the trial court found that Murdaugh needlessly mutilated Reynolds' body.  "Mutilation is an act distinct from the killing itself that includes the purposeful severing of body parts."  *Doerr*, 193 Ariz. at 68, ¶ 55, 969 P.2d at 1180.  Mutilation after death reflects a "mental state that is 'marked by debasement.'"  *State v. Vickers*, 129 Ariz. 506, 515, 633 P.2d 315, 324 (1981).  And, "[mutilation] alone supports the finding of heinousness or depravity."  *State v. Spencer*, 176 Ariz. 36, 44, 859 P.2d 146, 154 (1993).

¶64     In this case, Murdaugh admitted in his confession to Detective Griffiths that he cut off Reynolds' head and hands, removed Reynolds' finger pads from his hands, and pulled all the teeth from his head to prevent identification of his body.  In addition, Murdaugh told Detective Griffiths that he threw the teeth and finger pads out the window of his truck and buried Reynolds' head and hands in one shallow grave, and his torso in another.  Indeed, when Reynolds' body was discovered by the Yavapai County Sheriff's Office, Reynolds' head and hands had been removed from his body; his body was buried in one location and his head and hands in another.  We conclude beyond a reasonable doubt that Murdaugh's extensive and needless mutilation of his victim demonstrates depravity.  *See State v. Pandeli*, 204 Ariz. 569, 572, ¶ 8, 65 P.3d 950, 953 (2003) (finding that "[p]ost-mortem mutilation indicates a mental state that is marked by debasement" (internal quotations omitted)); *State v. James*, 141 Ariz. 141, 147, 685 P.2d 1293, 1299 (1984) (finding that "[t]he mode of disposing of the body itself demonstrates a certain callousness and depravity and disregard for the victim's family who might never have learned of the fate of [the victim]" (internal quotations omitted)).

¶65     The trial court also found that the murder was senseless.  "A murder is senseless when it is unnecessary for

the defendant to achieve his objective." *State v. Prince*, 206 Ariz. 24, 27, ¶ 10, 75 P.3d 114, 117 (2003) (quoting *State v. Hyde*, 186 Ariz. 252, 281, 921 P.2d 655, 684 (1996)). When Murdaugh directed Rohrs to get Reynolds to the house, his original intention was allegedly to teach Reynolds a lesson by breaking his jaw. As noted by the trial court, this could have been accomplished with one blow to Reynolds' head. Murdering Reynolds was not necessary to achieve Murdaugh's stated goal of teaching Reynolds a lesson. We thus conclude beyond a reasonable doubt that the killing was senseless.

¶66 Finally, the trial judge found that Reynolds was helpless. When Murdaugh and Dezarn entered the house, they were both armed. Reynolds was unarmed and outnumbered. He sat on the couch as Murdaugh yelled at him and watched as Murdaugh went through his personal belongings. Reynolds was unable to resist when Murdaugh and Dezarn marched him from the house to the garage — he was flanked on either side by an armed captor. Because the uncontroverted evidence established that Reynolds was helpless and did what he was told by his armed captors, Reynolds unquestionably was a helpless victim.

¶67 Senselessness and helplessness do not by themselves establish that the crime was heinous or depraved unless the state establishes additional circumstances that separate the crime from the "norm" of first degree murders. *Gretzler*, 135

Ariz. at 52-53, 659 P.2d at 11-12. In this case, not only did the State prove that the crime was senseless and that the victim was helpless, it also proved with uncontested evidence that the victim's body was mutilated. As noted above, mutilation by itself will establish the elements of heinousness or depravity. *Spencer*, 176 Ariz. at 44, 859 P.2d at 154. Consequently, we find beyond a reasonable doubt that the State established the (F)(6) aggravator and that no rational jury would have found differently.

¶68 Because the F(1) aggravating circumstance falls outside the *Ring* II rule, and the *Ring* II error with respect to F(6) circumstance was harmless beyond a reasonable doubt, Murdaugh's death penalty must stand unless a rational jury "would determine that the mitigating circumstances were sufficiently substantial to call for leniency." *Ring* III, 204 Ariz. at 565, ¶ 104, 65 P.3d at 945. We therefore shift our focus to whether reversible error occurred with respect to the mitigating circumstances. *Dann*, 206 Ariz. at 374, ¶ 12, 79 P.3d at 61.

## 2.

¶69 Murdaugh objected to the introduction of any mitigation on his behalf. Nevertheless, Murdaugh's trial attorney filed a sentencing memorandum, explaining that he was ethically bound to argue for life and against death. The trial

court also reasoned that it must consider mitigation and that the State, as an officer of the court, could be compelled to present such mitigation. As a result, the court placed the burden on the State and ordered it to present mitigating evidence.[5]

**a.**

¶70 In Arizona, although either the state or the defendant may present evidence of mitigation, it is the defendant who bears the burden of proving mitigating circumstances by a preponderance of the evidence. A.R.S. § 13-703(C) (Supp. 1995). A defendant may waive the presentation of mitigation if he is legally competent to do so. *See State v. Kayer*, 194 Ariz. 423, 436-37, ¶¶ 44-47, 984 P.2d 31, 44-45 (1999) (finding that a competent defendant may refuse to cooperate with the court-appointed mitigation specialist (citing *Blystone v. Pennsylvania*, 494 U.S. 299, 306 & n.4 (1990) (finding that no constitutional violation occurred when a defendant was allowed to waive all mitigation evidence after repeated warnings from the judge and advice from counsel))); *State v. Van Adams*, 194 Ariz. 408, 422, ¶ 51, 984 P.2d 16, 30 (1999) (upholding death sentence of defendant who waived mitigation, instructed his

---

[5] Neither party raised the issue of whether the trial court erred by ordering the State to assume this burden. Consequently, we will not address the propriety of the trial court's order.

counsel not to present mitigating evidence, and instructed his family not to cooperate with his counsel's efforts to investigate his background for purposes of presenting mitigation); *State v. Roscoe*, 184 Ariz. at 498, 910 P.2d at 649 (upholding trial court's grant of defendant's pro se motion to exclude certain portions of competency evaluation and noting that defendant was competent to seek such exclusion without counsel).  For this court to deem a decision to waive mitigation competent, the decision must be made voluntarily, knowingly, and intelligently.  *See Djerf*, 191 Ariz. at 591, ¶ 21, 594, ¶ 35, 959 P.2d at 1282, 1285 (holding that the waiver of a constitutionally protected right must be made voluntarily, knowingly, and intelligently).

¶71     The trial court found that Murdaugh's decision to waive the presentation of mitigating evidence was voluntary, knowing, and intelligent.  The court also found that Murdaugh was competent to waive mitigation.  Murdaugh does not contest either of these findings.  Consequently, we are left to decide whether "no reasonable jury could find that the mitigation evidence adduced during the penalty phase is 'sufficiently substantial to call for leniency.'"  *Ring III*, 204 Ariz. at 563, ¶ 93, 65 P.3d at 944 (quoting A.R.S. § 13-703(E) (Supp. 2003)).

**b.**

¶72    In his sentencing memorandum, Murdaugh's attorney raised one mitigating factor — that Murdaugh's ability to appreciate the wrongfulness of his conduct was impaired by methamphetamine use, but not so impaired as to constitute a defense to the crime. *See* A.R.S. § 13-703(G)(1) (Supp. 1995). Counsel also argued generally that the trial court was bound to consider all factors presented in mitigation, regardless of whether they constituted statutory mitigation.

¶73    The trial court noted that some evidence supported a finding of the statutory mitigating factor under A.R.S. § 13-703(G)(1), but found that this factor had not been proven by a preponderance of the evidence.[6] Section (G)(1) provides that if "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution," the court shall consider the diminished capacity as a mitigating circumstance. "Drug impairment can be a statutory mitigating circumstance if '[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of [the] law was *significantly* impaired, but not so impaired as to

---

[6]    We note that no reasonable jury could find the existence of the other statutory mitigating factors under A.R.S. § 13-703(G)(2) (substantial duress), (G)(3) (minor participant), (G)(4) (lack of forseeability), or (G)(5) (defendant's age).

constitute a defense to prosecution.'" *Sansing*, 206 Ariz. at 239, ¶ 26, 77 P.3d at 37 (first alteration and emphasis in original) (quoting A.R.S. § 13-703(G)(1)).

**¶74** Generally, drug ingestion or intoxication are insufficient to establish the (G)(1) mitigating circumstance. *Id.* (citing *State v. Jones*, 188 Ariz. 388, 400, 937 P.2d 310, 322 (1997); *State v. Jordan*, 126 Ariz. 283, 290, 614 P.2d 825, 832 (1980)). Instead, the defendant must establish a causal nexus between the drug use and the offense, typically through the presentation of an expert witness. *Id.* (citing *State v. Medina*, 193 Ariz. 504, 516, ¶ 50, 975 P.2d 94, 106 (1999); *State v. Ramirez*, 178 Ariz. 116, 131, 871 P.2d 237, 252 (1994); *State v. Stevens*, 158 Ariz. 595, 599, 764 P.2d 724, 728 (1988); *State v. Graham*, 135 Ariz. 209, 213, 660 P.2d 460, 464 (1983); *Gretzler*, 135 Ariz. at 57-58, 659 P.2d at 16-17). But "a defendant's claim of alcohol or drug impairment fails when there is evidence that the defendant took steps to avoid prosecution shortly after the murder, or when it appears that intoxication did not overwhelm the defendant's ability to control his physical behavior." *Id.* (quoting *State v. Rienhardt*, 190 Ariz. 579, 591-92, 951 P.2d 454, 466-67 (1997)).

**¶75** Here, the trial court observed that Murdaugh evinced various paranoid thoughts. The major feature of that paranoia

was the belief that the government had placed a tracking device in his head. The court concluded that when viewed in light of Murdaugh's long history of methamphetamine use, such paranoid delusions were likely secondary to Murdaugh's chronic drug use. In addition, Dr. Gina Lang, whom the State called during the sentencing hearing, testified that Murdaugh suffered from a personality disorder and that his methamphetamine use *may* have amplified the antisocial tendencies of this disorder.

¶76    On the other hand, the court stated that Murdaugh's paranoid delusion about a perceived threat from the government was not the impetus for his kidnapping and murder of Reynolds. Moreover, "[t]he industry and thought, manifested over an extended period of time, which went into the murder of David Reynolds belies a finding that [Murdaugh] was significantly impaired." The court found that this clarity of thought was further demonstrated by the actions Murdaugh took after he injured himself while cleaning his horse's hooves. Murdaugh had the presence of mind to seek treatment at the nearest hospital for the injury to his leg. Consequently, the court concluded that the record did not establish by a preponderance of the evidence that Murdaugh's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired.

¶77    Further, uncontroverted evidence in the record reveals

that Murdaugh took steps to avoid detection. First, during the kidnapping, he attempted to remove all fingerprints from Reynolds' van and to dispose of the van. Second, after the murder, he ordered Rohrs to clean up the blood in his garage. Third, he took Reynolds' body into the forest where he dismembered it in an effort to keep authorities from identifying the body. Fourth, when he discovered that the authorities were tracking the calls he made from Reynolds' cell phone, Murdaugh destroyed the phone and disposed of the pieces.

¶78 Finally, because Murdaugh elected to waive mitigation, he did not present any expert testimony to establish that his ability to control his behavior or appreciate the wrongfulness of his conduct was significantly impaired. As a result, he failed to establish a causal connection between his methamphetamine use and his actions. *See State v. Nordstrom*, 206 Ariz. 242, 248, ¶¶ 26-27, 77 P.3d 40, 46 (2003) (recognizing that although the evidence of a causal connection presented by Nordstrom was not compelling, because he presented expert testimony, this court could not conclude beyond a reasonable doubt that a jury would not have weighed the evidence differently than did the trial judge (citing *Sansing*, 206 Ariz. at 239, ¶ 26, 77 P.3d at 37 ("Typically, in those cases in which a defendant established statutory impairment, the defendant presented an expert witness."))).

¶79 Because of the complete lack of evidence of a causal connection between Murdaugh's drug use and the murder, we conclude beyond a reasonable doubt that no rational jury would have found that Murdaugh established the (G)(1) mitigating circumstance. This conclusion is bolstered by the undisputed evidence that Murdaugh made numerous efforts to avoid detection. We next examine the additional non-statutory mitigating circumstances found by the trial court.

### c.

¶80 A trial court is not limited to the consideration of only statutory mitigating circumstances, but instead must consider all relevant evidence offered in mitigation. A.R.S. § 13-703(G). As mentioned above, *see* ¶ 27, the trial court did find eight non-statutory mitigating circumstances. The trial court did not give these factors much weight and determined that the mitigating circumstances were not sufficiently substantial to outweigh the aggravating circumstances. Therefore, we must determine whether a jury could have weighed these mitigating factors differently than did the trial judge. *Ring III*, 204 Ariz. at 563, ¶ 93, 65 P.3d at 944.

¶81 The trial court first found that the evidence proffered in support of the (G)(1) mitigating circumstance also supported a finding of the following non-statutory mitigating circumstances: 1) impairment from the use of crystal

methamphetamine at the time of the offense; 2) impairment from chronic drug use; 3) personality disorder; 4) paranoid thoughts; and 5) potential impact of all four on Murdaugh's mental abilities. Nonetheless, the court accorded these factors little weight.

¶82        The reports prepared by Drs. Sindelar, Potts, and Scialli do reveal that Murdaugh experienced certain paranoid thoughts and delusions that were likely exacerbated by his history of chronic methamphetamine use. But because no mental health professional found a causal nexus between these conditions and the murders, *see* ¶¶ 73, 77-78, we find beyond a reasonable doubt that no rational jury would have weighed these factors any differently than did the trial judge.

¶83        Second, the trial court found evidence of the following additional non-statutory mitigation: cooperation with law enforcement; lack of prior criminal convictions; and desire to spare his family and victim's family from trial. We examine each of these findings in turn.

¶84        The trial court concluded that Murdaugh's cooperation with law enforcement was a mitigating circumstance, but the court did not give that circumstance much weight. Murdaugh did agree to voluntarily answer questions when he was approached by Detective Griffiths at the hospital. Before he answered any questions, however, Murdaugh first asked whether his garage had

been cleaned. Detective Griffiths responded that it had not been cleaned, to which Murdaugh replied that they "had enough to do [him] in." Murdaugh then described the events surrounding Reynolds' murder. Murdaugh also provided Detective Griffiths with a detailed map and directions to his campsite and to where he buried Reynolds' body and personal effects. From this sequence of events, it is clear that Murdaugh's cooperation came only after he learned that Rohrs had not cleaned up the garage. We therefore conclude that no reasonable jury would have given Murdaugh's cooperation more weight than did the trial court.

¶85    The trial court next found that Murdaugh's lack of prior criminal history was a mitigating circumstance, but the court did not place much weight on this factor. Similarly, in light of the nature and strength of the aggravating factors, we find that a jury hearing such evidence would not place more than minimal weight on this mitigating circumstance.

¶86    The trial court also found that Murdaugh's desire to spare his family and the victim's family from the pain of a trial was a mitigating circumstance. Murdaugh admitted his guilt and told Dr. Potts that he did not wish to put his family through the pain of a trial. The trial court gave "this factor little weight." We agree with the trial court and conclude beyond a reasonable doubt that a rational jury would have placed minimal weight on this circumstance.

¶87     In addition to the findings of the trial court, Murdaugh asserts that a jury could find other mitigating circumstances that might impact its determination of whether the mitigating circumstances are sufficiently substantial to call for leniency.  *See Prince*, 206 Ariz. at 28, ¶ 14, 75 P.3d at 118.  Specifically, Murdaugh argues that a jury could find the following additional mitigating circumstances:  Murdaugh offered Reynolds food; Murdaugh offered to give Reynolds a pillow while he was in the trunk of the car; Murdaugh opened the trunk lid when Reynolds complained that he was claustrophobic; and Murdaugh initiated the kidnapping scheme out his "perceived need to protect" Rohrs.  The record, however, provides little support for these proffered mitigating circumstances.

¶88     First, the record contains only one vague suggestion that Murdaugh offered Reynolds food.  Gross testified that Dezarn and Murdaugh ate their dinner in the living room but did not offer Reynolds any food.  Although Rohrs initially testified that no one offered Reynolds food, she later stated that she vaguely recalled that Murdaugh offered Reynolds a sandwich.  Dezarn, on the other hand, testified that he and Murdaugh did not eat until after they placed Reynolds in the trunk of the car in the garage.  Because there is so little evidence on this point, we find it inconceivable that a jury would accord this

evidence much weight, particularly in light of the aggravating circumstances.

¶89   Second, no evidence in the record supports Murdaugh's claim that he offered Reynolds a pillow.  Third, the record provides little support for the claim that Murdaugh opened the trunk to alleviate Reynolds' claustrophobia.  Dezarn testified that when Reynolds complained that he was claustrophobic, Murdaugh opened the trunk, but only for ten to fifteen minutes.[7] Although a jury could find that Murdaugh in fact opened the trunk for fifteen minutes, in view of the nine hours Reynolds spent locked in the trunk, we conclude that no reasonable jury would accord the evidence more than minimal weight.

¶90   Fourth, Murdaugh's claim that he needed to protect Rohrs is refuted by the record.  Although the record reflects that Murdaugh's initial goal was to teach Reynolds a lesson for offending Rohrs, as the night progressed, Murdaugh's actions went far beyond that stated goal.  As explained by the trial court, it was not necessary for Murdaugh to kill Reynolds to accomplish his goal.  No reasonable jury would find that Murdaugh's professed goal of protecting Rohrs mitigated his ultimate actions.

---

[7]  Other witnesses testified that when Reynolds knocked on the trunk, he was told to be quiet and was left in the trunk with the lid closed.

### e.

¶91    The unchallenged evidence in this case leaves no question that Murdaugh murdered Reynolds in an especially heinous and depraved manner and that he had a prior conviction for which he received a life sentence.  The circumstances of this murder, coupled with Murdaugh's mutilation of Reynolds' body, "clearly sets [this murder] apart from the norm of first degree murders."  *Sansing*, 206 Ariz. at 241, ¶ 38, 77 P.3d at 39.  Moreover, the mitigating evidence is so minimal that we conclude beyond a reasonable doubt that a jury would not have weighed the evidence of mitigation differently than did the trial judge.  Thus, we hold that any *Ring II* error was harmless.

### IV.

¶92    For the foregoing reasons, we affirm Murdaugh's convictions and death sentence.


_____
                        Michael D. Ryan, Justice



CONCURRING:


_____
Charles E. Jones, Chief Justice


- 44 -

_____

Ruth V. McGregor, Vice Chief Justice


_____

Philip G. Espinosa, Judge*


**B E R C H**, Justice, concurring in part and dissenting in part

**¶93**       I concur in that portion of the opinion affirming Murdaugh's convictions.   Op. ¶¶ 28-47.   I part ways with my colleagues, however, on the issue of sentencing.

**¶94**       In *Ring v. Arizona*, 536 U.S. 584, 589 (2002) (*Ring II*), the Supreme Court held that, in capital sentencing proceedings, "any fact on which the legislature conditions an increase" in punishment must be tried by a jury.  The import of the case is that juries must decide fact questions that bear on sentencing unless, beyond a reasonable doubt, the questions cannot reasonably be resolved other than as the trial judge resolved them.  *State v. Ring*, 204 Ariz. 534, 560, ¶ 79, 65 P.3d 915, 941 (2003) (*Ring III*) (requiring proof beyond a reasonable doubt); *State v. Pandeli*, 204 Ariz. 569, 572, ¶ 9, 65 P.3d 950, 953 (2003); *see also Blakely v. Washington*, 124 S. Ct. 2531 (2004).

**¶95**       On review of Ring's sentence on remand in that case, this court held that the imposition of aggravating factors was subject to review for harmless error.  *Ring III*, 204 Ariz. at

555, ¶ 53, 65 P.3d at 936. We have conducted harmless error reviews even in those cases in which the defendant has pled guilty and hence arguably agreed to be sentenced by the court. *See, e.g., State v. Sansing*, 206 Ariz. 232, 234-35, ¶¶ 1-3, 77 P.3d 30, 32-33 (2003); A.R.S. § 13-703.01(A) (Supp. 1995) (requiring independent review of trial court's findings of aggravating and mitigating circumstances). We do so to ensure that the state has carried its burden of proving the existence of the aggravating factors beyond a reasonable doubt. *Ring III*, 204 Ariz. at 563, ¶ 94, 65 P.3d at 944.

¶96 In amending Arizona's sentencing statute to comport with the *Ring II* mandate, the legislature extended the requirement of jury findings to cover all sentencing factors — that is, to include mitigating circumstances as well as aggravating circumstances. *See* 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 1 (codified at A.R.S. § 13-703). The fair import of these authorities is that questions of fact that bear on sentencing must be decided by the jury.

¶97 Soon after the passage of Arizona's new sentencing statute, this court applied the new provisions, remanding for resentencing a case involving aggravating factors very similar to the ones at issue in this case. *Pandeli*, 204 Ariz. at 572, ¶¶ 10-11, 65 P.3d at 953. In *Pandeli*, after affirming the (F)(2) factor and finding the evidence of the mutilation

component of the (F)(6) factor "overwhelming and essentially uncontroverted,"[8] we nonetheless concluded that a jury's "different finding of mitigating circumstances could affect the determination whether the mitigating circumstances are 'sufficiently substantial to call for leniency.'" *Id.* ¶ 10. We therefore reversed and remanded that case for resentencing. The same result should occur in Murdaugh's case.

¶98 Murdaugh pled guilty and stipulated to certain facts that we may accept as established for purposes of the guilt phase of this case. *See Sansing*, 206 Ariz. at 234, 235, ¶¶ 1, 8, 77 P.3d at 32, 33. Nonetheless, we must analyze whether the State has met its burden of proving the aggravating factors so conclusively that no reasonable jury could have decided them other than as the trial judge did. *Ring III*, 204 Ariz. at 563, ¶ 93, 65 P.3d at 944. We cannot merely decide that we would have ruled as the trial judge did or that the evidence supports the trial judge's determinations; instead we must be satisfied that no reasonable jury could decide the matter otherwise. *See id.* I do not have that level of comfort with the judicial fact-finding in this case.

¶99 I agree with my colleagues that the State has established that Murdaugh committed an offense for which a

---

[8] The defendant cut off the victim's nipples. *Pandeli*, 204 Ariz. at 572, ¶ 9, 65 P.3d at 953.

sentence of life imprisonment or death was imposable. *See* Op. ¶ 54; A.R.S. § 13-703(F)(1). I have concerns, however, with respect to the § 13-703(F)(6) "heinous, cruel or depraved" aggravating factor.

¶100    As the majority opinion correctly notes, *see* Op. ¶¶ 58-59, the heinous and depraved elements of this aggravating factor turn on the defendant's mental state, as it might be evidenced by the "*Gretzler*" factors.[9] *State v. Gretzler*, 135 Ariz. 42, 52, 659 P.2d 1, 11 (1983). In a case with similar facts on this issue, we concluded that given the defendant's history of paranoia and personality disorder, a jury might decide that the defendant's mental state precluded him from forming the required intent. *State v. Moody*, ___ Ariz. ___, ___, ¶ 231, 94 P.3d 1119, 1168 (2004). The same situation appertains in this case. There was substantial evidence that Murdaugh was a mental mess. Indeed, the trial judge found that Murdaugh was a chronic drug abuser who was specifically impaired by crystal meth at the time of the murder. Op. ¶ 27. The judge also found as mitigating factors that Murdaugh suffered from a personality disorder and paranoid thoughts that affected his mental abilities. *Id.* A jury might find these circumstances

---

[9]    Because the majority finds the "heinous or depraved" elements unequivocally established, the opinion does not analyze the "cruelty" element. Op. ¶¶ 57-59. For that reason, this dissent will not address that element.

more important than the judge did in deciding the (F)(6) issue. We cannot know. This possibility alone requires that the sentencing in this case be remanded to a jury.

¶101    Although the trial court found the element of "relishing" the murder, this court concluded that the State failed to prove that factor beyond a reasonable doubt. Op. ¶ 61. I agree.

¶102    A reasonable jury might also conclude that the State has not proved beyond a reasonable doubt that the manner of killing, a blow or blows to the victim's head, was sufficiently out of the norm of first degree murders to warrant a finding of heinousness. If it could reasonably do so, we would defer to that finding. A jury should be given the opportunity to decide the question.

¶103    The mutilation of the victim's body is the clearest of the *Gretzler* factors and the one on which the majority relies to establish heinousness or depravity.[10]    Op. ¶¶ 62-63.    While Murdaugh clearly did mutilate the victim's body, his reason for doing so was not to debase or insult the victim, but rather to avoid detection. That being the case, the jury might conclude that it was not "needless." Op. ¶ 64. But even if the jury did

---

[10]    As the opinion correctly notes, a finding of mutilation will by itself support a finding of heinousness or depravity. Op. ¶ 62 (citing *State v. Spencer*, 176 Ariz. 36, 44, 859 P.2d 146, 154 (1993)).

- 49 -

find the mutilation factor, as it likely will, it might weigh that factor differently than the trial judge did.

¶104     The court concludes, beyond a reasonable doubt, that the murder was "senseless." Op. ¶ 64 (citing *State v. Hyde*, 186 Ariz. 252, 281, 921 P.2d 655, 684 (1996)). While I agree that most jurors probably would also find the murder senseless, I cannot say that this court would necessarily reverse the verdict of a jury that found this murder not to have been more senseless than other first degree murders. This is a fact question that a jury should decide.

¶105     Fact questions also exist regarding the "helplessness" consideration. While again I would certainly affirm a jury verdict that finds the victim to have been helpless, I cannot say beyond a reasonable doubt that a jury would be unreasonable in finding the victim not to have been *especially* helpless — or so helpless as to separate him from the "norm" of murder victims.

¶106     These are the kinds of fact-based determinations that the Supreme Court and our legislature have said jurors should make. Although the jurors will probably decide the issues as the trial judge in this case did, we cannot know that they would do so, and the Defendant has the right to try to persuade them to do otherwise. The jurors may weigh more heavily Murdaugh's mental state or find the murder not to be so much above the norm

of first degree murders in terms of heinousness or depravity that it warrants imposition of the death penalty.

¶107    Let me stress that this court would certainly affirm the verdict of any jury that found these aggravating factors to exist and decided the case precisely as the trial judge did. But that is not the standard for deciding whether to affirm the findings of aggravating circumstances by a trial judge.  The question before us is whether, if a jury found that the murder was not especially cruel, heinous or depraved, we would conclude that no reasonable jury could have so found.  *See Pandeli*, 204 Ariz. at 572, ¶ 9, 65 P.3d at 953.  I do not think we would.

¶108    But even if I could agree with respect to the judge's determination of the facts relating to the aggravating factors, I cannot do so with respect to the mitigating factors.  The opinion acknowledges that "some evidence supported a finding of the statutory mitigating factor [of drug impairment] under A.R.S. § 13-703(G)(1)," but notes that the trial judge "found that the factor had not been proven by a preponderance of the evidence."  Op. ¶ 73.  Under *Ring II* and Arizona's new implementing statute, it was not the province of the trial judge to make that determination.  A jury might have found otherwise. The Defendant has the right to present the facts bearing on sentencing to a jury.  *See* A.R.S. § 13-703(C) (jurors need not unanimously agree that mitigating factors have been proved by a

preponderance of the evidence).

¶109    Moreover, a jury must be given the opportunity to consider and weigh the other mitigating factors.  The trial judge found eight non-statutory mitigating factors.  *See* Op. ¶ 80.  Who can say that a jury would not have found more?  Or fewer?  Nor can I confidently say, beyond a reasonable doubt, that the jurors would have weighed the mitigating factors the way the trial judge did.  I cannot know whether the jurors would weigh as lightly as the trial judge did Murdaugh's impairment from drug use at the time of the murder, his diminished mental abilities, his cooperation, his remorse, or his desire to spare his family and the victim's family.  They might well; but they would not be unreasonable if they gave greater weight to such factors.

¶110    As we did in *Pandeli*, I would also conclude here that reasonable jurors might find other mitigating factors to exist or might weigh the aggravating and mitigating factors differently than the trial judge did.  204 Ariz. at 572, ¶ 10, 65 P.3d at 953.

¶111    In short, I would affirm Murdaugh's convictions and allow the trial judge's legal finding of the (F)(1) aggravator to stand.  But I would find that the error in judge-sentencing was not harmless, and would therefore reverse the sentencing and remand to allow a jury to find those factors that would increase

the penalty to death and those that might tilt the scales in favor of leniency, and to weigh those factors in the critical life and death balance.  I think such a result is required by *Ring II*, *Ring III*, *Blakely*, and A.R.S. § 13-703.01.


_____
Rebecca White Berch, Justice


* The Honorable Andrew D. Hurwitz recused himself.  Pursuant to Article 6, Section 3, of the Arizona Constitution, the Honorable Philip G. Espinosa, Chief Judge of the Arizona Court of Appeals, Division Two, was designated to sit for Justice Hurwitz.