**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL JOE MURDAUGH,
*Petitioner-Appellant*,

v.

CHARLES L. RYAN,
*Respondent-Appellee*.

No. 10-99020

D.C. No.
2:09-CV-00831-FJM

OPINION

Appeal from the United States District Court
for the District of Arizona
Frederick J. Martone, District Judge, Presiding

Argued and Submitted
February 13, 2013—San Francisco, California

Filed July 26, 2013

Before: Dorothy W. Nelson, Stephen Reinhardt,
and Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Nelson

## SUMMARY[*]

### Habeas Corpus/Death Penalty

The panel reversed in part and affirmed in part the district court's denial of a 28 U.S.C. § 2254 habeas corpus petition challenging a conviction and capital sentence for murder.

The panel reversed the district court's denial of relief as to petitioner Murdaugh's claim of error under *Ring v. Arizona*, 536 U.S. 584 (2002), which requires a jury determination of the presence or absence of aggravating factors supporting the death penalty. After acknowledging that *Ring* error is subject to the harmless error test, the panel concluded that the *Ring* error had a substantial and injurious effect or influence on the trial court's failure to find the mitigating factor regarding Murdaugh's capacity to appreciate the wrongfulness of his conduct or conform it to the requirements of law, and thus on the trial court's imposition of a death sentence. The panel explained that, had the state supreme court considered all of the evidence, it would have been impossible to conclude that no rational jury could have found this factor. Having granted relief as to this claim, the panel reserved judgment on Murdaugh's claims about his competence to waive the presentation of mitigating evidence at sentencing.

The panel otherwise affirmed the district court's decision. The panel next held that the state court did not violate Murdaugh's constitutional rights by applying an

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

unconstitutional causal nexus test to mitigating evidence of his drug use and delusions. The panel also held that Murdaugh was not denied his right to conflict-free representation when the prosecutor presented mitigating evidence at the behest of the trial court after Murdaugh declined to present such evidence, because the prosecutor did not represent Murdaugh. The panel also denied relief as to Murdaugh's challenges to his guilty plea.

## COUNSEL

Paula K. Harms (argued) and Therese M. Day, Federal Public Defender's Office, Phoenix, Arizona, for Petitioner-Appellant.

Jeffrey A. Zick (argued), Arizona Attorney General's Office, Phoenix, Arizona, for Respondent-Appellee.

## OPINION

NELSON, Senior Circuit Judge:

Petitioner Michael Joe Murdaugh appeals the denial of his federal habeas petition, which challenges his murder conviction and death sentence. Murdaugh claims that the district court erred in denying claims brought pursuant to *Ring v. Arizona*, 536 U.S. 584 (2002), and *Tennard v. Dretke*, 542 U.S. 274 (2004), as well as claims raising other errors by the state court and the ineffective assistance of counsel. Murdaugh also argues that the district court erred in deeming various claims procedurally defaulted. We grant relief on

Murdaugh's *Ring* claim and reserve judgment on Murdaugh's claims about his competence to waive the presentation of mitigating evidence. We otherwise affirm the district court.

## I. Background

### 1. The Murders of David Reynolds and Douglas Eggert

On June 26, 1995, Murdaugh's girlfriend, Rebecca Rohrs, met David Reynolds at a gas station.[1] She told him she was looking for a job, and they exchanged phone numbers. The conversation took a sordid turn when Reynolds offered to pay Rohrs to perform oral sex. Rohrs declined, returned home, and described the encounter to Murdaugh. Murdaugh decided "to teach Reynolds a lesson," and told Rohrs to invite him over. Murdaugh then left with his friend Jesse Dezarn to buy methamphetamine, instructing Rohrs to page them as soon as Reynolds arrived.

When they learned that Reynolds had arrived, Murdaugh and Dezarn quickly returned to the house, brandishing firearms. While Murdaugh confronted Reynolds, Rohrs and her friend Betty Gross looted Reynolds's plumbing van outside. Murdaugh eventually came out of the house and reprimanded them for not wearing gloves and leaving fingerprints on everything. He exclaimed, "Do you know what I am going to have to do now?"

---

[1] These facts are drawn from the Arizona Supreme Court's summary of the evidence supporting Murdaugh's convictions, which are "presumed to be correct," unless Murdaugh rebuts that presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Murdaugh does not challenge any of these facts in his petition.

Later that night, Murdaugh took Reynolds to his garage and ordered him into the trunk of his car. Murdaugh, Dezarn, Gross, and Rohrs all returned to the garage throughout the night to use methamphetamine.

In the early hours of the next morning, Murdaugh and Dezarn decided to abandon Reynolds's van near a cemetery. While stopping for gas on the way back to the house, they ran into an acquaintance, Ron Jesse. They asked Jesse for drugs, and he returned to the house with them. Dezarn and Jesse then left the house to buy more methamphetamine. Upon their return, Murdaugh, Dezarn, and Jesse began using methamphetamine in the garage. At around 8:30 AM, Gross and Rohrs joined them, and the group continued taking drugs.

While they were all in the garage, Murdaugh opened the trunk of his car to show Jesse that he was holding Reynolds inside. At this point, Reynolds asked to use the bathroom. Murdaugh led Reynolds to a corner of the garage to urinate, and while Reynolds's back was turned, Murdaugh struck him on the head with a meat tenderizer. Reynolds fell to the ground, and Murdaugh picked up a metal jackhammer spike and continued to hit him in the face and head. Three major crushing blows to Reynolds's skull killed him. Murdaugh then instructed Gross and Rohrs to sprinkle horse manure over the body and the surrounding blood.

At some point after the murder, Jesse attempted to leave Murdaugh's property but could not because the gate was locked. Murdaugh approached Jesse and threatened him, saying that if he told anyone what happened, Murdaugh would "kill [Jesse] last and peel the skin off his children."

That evening, Murdaugh and Dezarn loaded Reynolds's body into Murdaugh's horse trailer. Murdaugh told Rohrs to clean up the blood in the garage and then left to go camping. At the campsite, Murdaugh dismembered Reynolds's body in an effort to prevent identification of the remains. He cut off Reynolds's head and hands, sliced off Reynolds's finger pads, and pulled out Reynolds's teeth. As he was driving to a separate site to bury the body, he threw the teeth and finger pads from the window of his truck. He then buried the head and hands in one shallow grave and the torso in another.

Over the next several days, the police began investigating Reynolds's disappearance. The police found Reynolds's van, obtained copies of Reynolds's cell phone records, and then contacted Rohrs. The police also interviewed Jesse, who told them he had witnessed Reynolds's murder. The police obtained a search warrant for Murdaugh's home and garage and found the scene exactly as Murdaugh had left it. The Maricopa County Sheriff's Office put out an alert notifying law enforcement agencies that they were looking for Murdaugh.

Investigators ultimately tracked down Murdaugh after he checked himself into an emergency room for a knife wound he sustained while cleaning one of his horses's hooves. After waiving his *Miranda* rights, Murdaugh confessed to the murder and told the detectives where to find Reynolds's body. Because Reynolds's murder was similar to the previous murder of a victim named Douglas Eggert, the police asked Murdaugh if he had ever done anything like this before. Murdaugh then admitted to killing Eggert by beating him to death with a meat tenderizer.

## 2. Conviction

An Arizona grand jury charged Murdaugh with first degree murder, kidnapping, aggravated robbery, and aggravated assault in connection with Reynolds's death. It also charged Murdaugh with the first-degree murder and kidnapping of Eggert. The state appointed Jess Lorona to represent Murdaugh.

In November 1998, the trial court ordered a competency screening of Murdaugh. Dr. Jack Potts, a forensic psychologist, noted that Murdaugh held some fringe beliefs but expressed a desire to plead guilty to avoid putting his family and those of the victims through a trial. Dr. Potts concluded that Murdaugh was aware of the charges against him and understood both his constitutional rights and the consequences of pleading guilty.

The court then appointed Drs. Scialli and Sindelar to assess Murdaugh's competence. Both found Murdaugh competent to plead guilty. The parties stipulated that the court could determine Murdaugh's competency on the basis of these reports. The trial court then found Murdaugh competent.

Around this time, Murdaugh repeatedly requested a skull x-ray because he believed that a tracking device had been implanted in his head. The deputy district attorney, Mark Barry, asked the court to order the skull x-ray. He argued that the x-ray would reassure Murdaugh that no tracking device existed and that it would "alleviate any potential coercive allegations raised at any future plea proceedings." The trial court granted the request.

In May 1999, the trial court ordered a competency screening to reevaluate Murdaugh. Dr. Potts submitted a screening evaluation of Murdaugh in September 1999, in which he described Murdaugh as "continuing to experience paranoid beliefs and delusions secondary to his past amphetamine abuse." Dr. Potts recounted that Murdaugh had requested a skull x-ray but had received a CT scan instead. The scan did not show an implant, but Murdaugh believed the results were doctored and requested an MRI. Dr. Potts concluded that Murdaugh "is an intelligent man who is simply expressing a very strong desire based on a clearly false belief. He is capable of weighing various options." Dr. Potts opined that Murdaugh "fully appreciates the necessary waiver of his rights by entering a plea of guilty," and "fully understands the consequences of entering the plea."

Murdaugh pled guilty to both indictments in January of 2000. The plea agreement provided that the state would not seek the death penalty for Eggert's murder, but that the conviction for that crime could still constitute an aggravating factor in sentencing Murdaugh for Reynolds's murder.

## 3. Sentencing

Over the course of the next year, the defense team prepared a mitigation case by retaining a psychiatrist and an addictionologist, seeking the release of Murdaugh's Rolodex from the state to contact character witnesses, and having the mitigation specialist prepare a mitigation report. The trial court ordered Murdaugh's mitigation experts, Dr. Demming and Dr. Shaw, and Lisa Christianson, to submit their reports to the state by August 24, 2001.

On August 27, 2001, Lorona notified the state that Murdaugh would not allow him to file with the court, or provide to the prosecution, any of the mitigation materials the defense had prepared. The state moved to compel and sought sanctions against Lorona.

The trial court held a hearing on September 7, 2001. Lorona told the court that Murdaugh feared that his life was in danger and believed that staying in the Arizona Department of Corrections would effectively be a death sentence whether or not he was sentenced to death. Lorona had asked the state to agree to an interstate compact to allow Murdaugh to serve his time outside Arizona, but the state refused. The court clarified that it did not have the authority to tell the Department of Corrections where to place an inmate.

Because he could not serve a life sentence outside of Arizona, Murdaugh instructed his counsel that he did not want to put on any mitigation case at all. The court informed Murdaugh that if he did not present mitigation, the court would seek mitigating evidence from any source legitimately available to the court and would put the burden on the state to provide mitigating evidence.

Three weeks later, the court held another hearing about Murdaugh's objection to the presentation of mitigating evidence. Lorona explained that though he thought Murdaugh was competent to waive mitigating evidence, the court was required to determine the competency issue before proceeding. The court considered whether it could compel either side to present mitigating evidence and asked for evidence regarding Murdaugh's competence.

The DA offered the testimony of the state's expert, Dr. Lang. Dr. Lang had experience conducting competency evaluations but did not do one in this case. She testified that during the time she spent with Murdaugh, she did not observe any indications that the petitioner was unable to understand the nature of the proceedings against him or that he was incompetent. Dr. Lang also testified that Murdaugh was able to state the charges against him, seemed to understand her questions, and appeared coherent, and that she had no reason to disagree with the prior competency determinations made before Murdaugh pled guilty. Lorona asked the court to take judicial notice of the earlier reports submitted by Drs. Scialli, Sindelar, and Potts regarding Murdaugh's competence to plead guilty. The court did so.

The court found Murdaugh competent to assist counsel, to understand the nature of the proceedings, and to waive his right to present mitigating evidence. The court went on to conclude that the petitioner had a Fifth Amendment right "not to testify directly or indirectly through other means." The court ruled that it would not compel the defense to present mitigation but that it would compel the state to do so.

The state then proceeded to present mitigating evidence. The state first moved to admit the materials Dr. Deming used in preparing his report, as well as a preliminary draft of Dr. Deming's report and a 1978 medical records evaluation of Murdaugh. Defense counsel objected, arguing that any information beyond what was contained in the Rule 11 competency reports was private. The trial court sustained the objection and declined to consider these materials, finding that to do so would moot Murdaugh's waiver of mitigation.

The state next called Dr. Lang to offer mitigating evidence. Dr. Lang testified that she had diagnosed Murdaugh with polysubstance dependence based on his history of drug abuse and with antisocial personality disorder based on his history of aggressive and violent behavior, disrespect for society, involvement in illegal activity, and personality testing. Dr. Lang also testified that she did not believe Murdaugh was paranoid or delusional at the time of the offense, that neither his capacity to appreciate the wrongfulness of his conduct nor to conform his conduct to the requirements of law were significantly impaired at the time of the offense, and that his cognitive functioning was unimpaired.

More than halfway through this testimony, Lorona asked, "Is there some mitigation here somewhere?" The court noted its concern that the state was using the presentation of mitigating evidence as a pretense to introduce additional aggravating evidence. The court then proceeded to question Dr. Lang directly about Murdaugh's drug use leading up to Reynolds's murder and how it affected Murdaugh's mental state. Dr. Lang testified that the psychological impact of methamphetamine ingestion varies but can include euphoria, a feeling of power, increased energy, and decreased need to sleep or eat; it also may aggravate aggression and paranoia. Defense counsel declined to cross-examine Dr. Lang.

Despite Murdaugh's decision to waive mitigation, Lorona filed a six-page sentencing memorandum that was limited to the evidence that had been filed with the court. It did not refer to any of the mitigation reports. Counsel argued that Murdaugh's convictions for Eggert's death could establish

either of two aggravating factors[2]: that Eggert's murder was a crime for which Murdaugh could be sentenced to life imprisonment or the death penalty, (F)(1), or that Eggert's murder was a prior violent felony, (F)(2). Ariz. Rev. Stat. §§ 13-703(F)(1), (F)(2) (2001). Counsel argued, though, that in accordance with the terms of the plea agreement, Eggert's murder could not establish both factors. Counsel also argued that the state had not established aggravating factor (F)(5), pecuniary gain. Finally, counsel argued that the state had not proved beyond a reasonable doubt factor (F)(6) or that the

---

[2] At the time of Murdaugh's sentencing, Arizona law required a sentencing judge to find one or more of fourteen enumerated aggravating circumstances before a capital defendant could be eligible for the death penalty. *See* Ariz. Rev. Stat. § 13-703(E). The four aggravating circumstances relevant to this appeal are:

> (F)(1). The defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable.

> (F)(2). The defendant has been or was previously convicted of a serious offense, whether preparatory or completed. Convictions for serious offenses committed on the same occasion as the homicide, or not committed on the same occasion but consolidated for trial with the homicide, shall be treated as a serious offense under this paragraph.

> (F)(5). The defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value.

> (F)(6). The defendant committed the offense in an especially heinous, cruel or depraved manner.

*See id.* § 13-703(F).

offense was committed in an especially heinous, cruel, or
depraved manner. With respect to statutory mitigating
circumstances,[3] counsel asserted that Murdaugh's
methamphetamine use rendered him unable to appreciate the
wrongfulness of his conduct or to conform his conduct to the
requirements of the law, but not so much as to constitute a
defense. Counsel pointed to testimony offered at presentence

---

[3] Arizona law at the time required a sentencing judge to consider five
"statutory" mitigating circumstances:

> (G)(1). The defendant's capacity to appreciate the
> wrongfulness of his conduct or to conform his conduct
> to the requirements of law was significantly impaired,
> but not so impaired as to constitute a defense to
> prosecution.
>
> (G)(2). The defendant was under unusual and
> substantial duress, although not such as to constitute a
> defense to prosecution.
>
> (G)(3). The defendant was legally accountable for the
> conduct of another under the provisions of § 13-303,
> but his participation was relatively minor, although not
> so minor as to constitute a defense to prosecution.
>
> (G)(4). The defendant could not reasonably have
> foreseen that his conduct in the course of the
> commission of the offense for which the defendant was
> convicted would cause, or would create a grave risk of
> causing, death to another person.
>
> (G)(5). The defendant's age.

Ariz. Rev. Stat. § 13-703(G). It also required the judge to consider any
other "nonstatutory" mitigating circumstances that were "relevant in
determining whether to impose a sentence less than death." *Id.*

hearings that Murdaugh was under the influence of methamphetamine at the time of the killing.

The trial court sentenced Murdaugh to death. The court found Reynolds's murder was especially cruel, heinous or depraved under Arizona Revised Statute § 13-703(F)(6), and found Eggert's murder to be an aggravating circumstance under Arizona Revised Statute § 13-703(F)(1). The court considered the five statutory mitigating factors. *Id.* §§ 13-703(G)(1)–(5). The court found that there was some evidence to support factor (G)(1), that the defendant's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was significantly impaired. This evidence included the four reports prepared for Murdaugh's competency determinations before he pled guilty, his paranoid thoughts, and his long history of chronic drug abuse. The court also considered the testimony of Dr. Lang, but "only to the extent her testimony offered mitigating evidence." The court ultimately concluded that the evidence did not establish the (G)(1) mitigating factor.

The court next found eight non-statutory mitigating factors: (1) Murdaugh was under the influence of drugs at the time of the crime; (2) he was a chronic drug abuser; (3) he has a personality disorder; (4) he experiences paranoid thoughts; (5) the combination of these four circumstances may have impacted his mental abilities; (6) he cooperated with law enforcement; (7) he lacked a prior criminal record; and (8) he admitted guilt and expressed concern toward the families of his victims. The court afforded these factors little weight and the aggravating factors great weight. The court concluded that the nonstatutory factors were insufficient to warrant leniency.

## 4.  Direct Appeal

The Arizona Supreme Court upheld Murdaugh's convictions and death sentence on direct appeal. *State v. Murdaugh*, 97 P.3d 844 (Ariz. 2004) (en banc). The court addressed four issues. First, it held that the delay in Murdaugh's case did not constitute cruel and unusual punishment. *Id.* at 851. Second, it held that reasonable evidence supported the trial court's finding that Murdaugh was competent to plead guilty. *Id.* at 852. Third, the court rejected Murdaugh's argument that his guilty plea was not knowingly made because he was not told he had a Sixth Amendment right to have a jury determine his sentence. *Id.* at 853–54. The court held that such a right did not exist at the time Murdaugh pled guilty. *Id.* at 853. Additionally, the court found nothing in the record that indicated that Murdaugh's decision to plead guilty was influenced by whether a judge or a jury would decide if he deserved to be sentenced to death. *Id.* at 854.

Finally, the court addressed Murdaugh's *Ring* claim that he was improperly sentenced by a judge rather than a jury. *Id.* at 854–62. The court began by reiterating that *Ring* error is procedural error subject to harmless error review, not structural error as Murdaugh argued. *Id.* at 854–55. Reviewing Murdaugh's sentence for harmless error, the court found that the (F)(1) aggravating factor fell outside the *Ring* rule and that the state had proven the (F)(6) aggravating factor beyond a reasonable doubt. *Id.* at 855–58. Considering the mitigating evidence adduced during the penalty phase, including Murdaugh's sentencing memorandum, Dr. Lang's testimony during the sentencing hearing, the facts as recounted by the trial court, evidence that Murdaugh took steps to avoid detection, and the competency

reports produced before the plea agreement, the court held that no reasonable jury could find that the evidence was "sufficiently substantial" to call for leniency. *Id.* at 859–60. The court further held that because no mental health professional found a causal nexus between Murdaugh's paranoid thoughts and delusions and the murders, no reasonable jury would have weighed these factors any differently than did the trial judge. *Id.* at 860. Finally, the court noted that the record did not support any mitigating circumstance not considered by the trial court. *Id.* at 861–62.

Justice Berch dissented on the *Ring* issue. *Id.* at 862–64. She argued that a jury could have found the evidence of Murdaugh's mental impairment from chronic drug abuse more important than the judge did in deciding the (F)(6) aggravating factor. *Id.* at 863–64. She also pointed out that the majority acknowledged that "some evidence support[ed] a finding of the statutory mitigating factor [of drug impairment] under [Ariz. Rev. Stat.] § 13-703(G)(1)" making it plausible that a reasonable jury could have found that the factor existed. *Id.* at 864. Finally, she noted that the aggravating factors here were similar to those in *State v. Pandeli*, 65 P.3d 950 (Ariz. 2003), a case in which the court remanded for resentencing. *Id.*

## 5.  Post-Conviction Review

Murdaugh raised twelve claims in his petition for post-conviction review, and the Arizona state court denied relief. Concerning his claim that the competency determination was inadequate, the court found that there was no need for the trial court to conduct a further competency determination, as the record was devoid of any evidence suggesting that

Murdaugh's decision to plead guilty was not based on his desire to spare the victim's family and his family from trial.

The court held that Murdaugh's second claim for invalid waiver of mitigation was precluded because he failed to raise the claim on appeal. The court further found that Murdaugh was aware of the mitigation evidence that could be presented but nevertheless decided not to present it. The court also noted that the trial court "considered and found mitigation" despite Murdaugh's waiver.

The court found Murdaugh's third claim for mental competence was precluded.

The court dismissed Murdaugh's fourth claim that his guilty plea and decision to waive mitigation were involuntary because they were the products of false promises and threats, finding that the trial court carefully questioned Murdaugh during his plea colloquy and that Murdaugh told the trial court there were no other promises made to him.

The court set an evidentiary hearing to determine the merits of Murdaugh's sixth claim for ineffective assistance of trial counsel. The court rejected Murdaugh's claims about inadequate public financing of his trial and appellate counsel, finding that there was no legal basis to determine that the Office of Court Appointed Counsel's authorized pay scale was inadequate.

The court held the trial court's order that the prosecutor present mitigation evidence did not create a conflict of interest, and additionally that this claim was precluded.

Concerning Murdaugh's claim that the sentencing court used an unconstitutional nexus text, the court held that the court used the lack of a causal nexus to weigh the evidence, rather than to screen it out. The court pointed out that the trial court did in fact find Murdaugh's mental state and methamphetamine addiction at the time of the crime to be mitigating circumstances, and gave them little weight.

The court summarily dismissed Murdaugh's claim that the Arizona Supreme Court erroneously determined that the *Ring* violation was subject to harmless error analysis, and his claim that his appellate counsel was ineffective for failing to raise the issue of whether a *Ring* violation is subject to harmless error analysis and for failing to raise whether there was a proper determination that the *Ring* violation was harmless error.

The court also dismissed Murdaugh's claim that lethal injection is cruel and unusual punishment.

## 6.  State Court Evidentiary Hearing

The post-conviction court held an evidentiary hearing to determine the merits of Murdaugh's alleged fifteen instances of ineffective assistance of trial counsel. Murdaugh claimed his counsel knew or should have known that he was not competent to waive mitigation and that counsel breached his duty to investigate Murdaugh's competency further. The court reviewed all of the doctors' reports that trial counsel had before Murdaugh waived mitigation and found that nothing in the record, or in the evidence presented during the evidentiary hearing, showed that Murdaugh's competence at the time he waived mitigation had deteriorated from the time he was deemed competent at his change of plea. Moreover,

no evidence had been presented to undermine the trial court's finding of competence. The court also concluded that Murdaugh failed to show prejudice both because a competent defendant has the right to ignore the intelligent advice of his counsel, and because the mitigating evidence, if presented, would not have overcome the aggravating evidence. The court declined to consider trial counsel's performance.

The Arizona Supreme Court denied Murdaugh's petition for review of the denial of post-conviction relief.

**7. District Court Decision**

Murdaugh filed a federal habeas petition, which the district court denied in full. The court also denied Murdaugh's motions for evidentiary development. The court found that many of the claims were record-based and did not require evidentiary development. For those that were not record-based, the court found that Murdaugh had not shown good cause for discovery or had failed to identify contested facts bearing on the merits of his petition. The court also denied an evidentiary hearing. The court granted a certificate of appealability with respect to eight claims. We expanded the certificate of appealability to include four additional claims briefed by Murdaugh on appeal.

## II. Standard of Review

We review the denial of habeas relief de novo, *Doody v. Ryan*, 649 F.3d 986, 1001 (9th Cir. 2011) (en banc), and the district court's findings of fact for clear error, *Brown v. Ornoski*, 503 F.3d 1006, 1010 (9th Cir. 2007). We review the denial of an evidentiary hearing for abuse of discretion. *Stanley v. Schriro*, 598 F.3d 612, 617 (9th Cir. 2010).

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs Murdaugh's petition because he filed it after the statute went into effect. *See Lindh v. Murphy*, 521 U.S. 320, 336–37 (1997). AEPDA circumscribes a federal court's power to grant habeas relief to a state prisoner. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). When a state court has adjudicated a claim on the merits, we may grant relief only if the state court's resolution of that claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Clearly established federal law "refers to the holdings, as opposed to the dicta, of th[e Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision can involve an unreasonable application of Supreme Court precedent in one of two ways: "[I]f the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. "Stated simply, a federal habeas court making the 'unreasonable application' inquiry

should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. In considering whether the state court unreasonably applied clearly established federal law, review is limited to the factual record that was before the state court that adjudicated the claim on the merits. *Pinholster*, 131 S. Ct. at 1398.

In determining whether a state court made an unreasonable determination of the facts, "it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004).

## III. Discussion

### 1. *Ring* Claim

In *Ring v. Arizona (Ring II)*, 536 U.S. 584, 588–89 (2002), the Supreme Court held that a defendant is entitled to a jury determination of "the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty." This holding followed from the Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), that a criminal defendant has a Sixth Amendment right to have a jury determine "any fact that increases the penalty for a crime beyond the prescribed statutory maximum." In response to *Ring II*, Arizona amended its capital sentencing scheme. *See State v. Ring (Ring III)*, 65 P.3d 915, 926 (Ariz. 2003) (en banc) (describing Senate Bill 1001). The new procedure allowed the jury to find and

consider the effect of aggravating and mitigating circumstances and to decide whether the defendant should be sentenced to death. Ariz. Rev. Stat. § 13-703.01(D) (2002).

On remand from the Supreme Court, the Arizona Supreme Court considered the impact of *Ring II* on all capital cases then pending on direct appeal. *Ring III*, 65 P.3d at 925. The court held that failing to submit capital aggravating factors to a jury did not require reversing the sentence if the error was harmless. *Id.* at 933–36. In reviewing *Ring* error for harmlessness, the court concluded that it was required to consider whether reversible *Ring* error occurred with respect to both the aggravating and mitigating circumstances. *See id.* at 942–43. In separate opinions, the court then individually reviewed for *Ring* error the death sentences of twenty-one defendants. In nineteen of these cases, the court found *Ring* error was not harmless and remanded for resentencing.[4] Here, obviously, the court did not.

---

[4] *State v. Lamar*, 115 P.3d 611 (Ariz. 2005); *State v. Moody*, 94 P.3d 1119 (Ariz. 2004); *State v. Dann*, 79 P.3d 58 (Ariz. 2003); *State v. Montano*, 77 P.3d 1246 (Ariz. 2003); *State v. Nordstrom*, 77 P.3d 40 (Ariz. 2003); *State v. Rutledge*, 76 P.3d 443 (Ariz. 2003); *State v. Prasertphong*, 76 P.3d 438 (Ariz. 2003); *State v. Ring*, 76 P.3d 421 (Ariz. 2003); *State v. Cropper*, 76 P.3d 424 (Ariz. 2003); *State v. Prince*, 75 P.3d 114 (Ariz. 2003); *State v. Jones*, 72 P.3d 1264 (Ariz. 2003); *State v. Phillips*, 67 P.3d 1228 (Ariz. 2003); *State v. Finch*, 68 P.3d 123 (Ariz. 2003); *State v. Tucker*, 68 P.3d 110 (Ariz. 2003); *State v. Lehr*, 67 P.3d 703 (Ariz. 2003); *State v. Harrod*, 65 P.3d 948 (Ariz. 2003); *State v. Pandeli*, 65 P.3d 950 (Ariz. 2003); *State v. Hoskins*, 65 P.3d 953 (Ariz. 2003); *State v. Canez*, 74 P.3d 932 (Ariz. 2003).

## A)  Scope of the Right

We must first determine the scope of the right articulated in *Ring II*.  The state argues that our review for *Ring* error is limited by the express wording of *Ring II*, 536 U.S. at 588–89, which addressed only "the aggravating factors required by Arizona law for imposition of the death penalty."[5] A narrow reading of *Ring II* would extend the Sixth Amendment right no further than its express holding by concluding that a defendant only has a right to have a jury determine aggravating factors.

We are not convinced that *Ring II* should be read so narrowly.  Echoing *Apprendi*, the *Ring II* Court held that a jury must find any fact upon which the "increase of a defendant's authorized punishment [is] contingent." *Ring II*, 536 U.S. at 602 (citing *Apprendi*, 530 U.S. at 482–83).  The Court stressed that "the inquiry is one not of form, but of effect." *Id.* (quoting *Apprendi*, 530 U.S. at 494) (internal quotation marks omitted).  Because the penalty of death was contingent on the presence or absence of aggravating factors under Arizona law, the Court held that *Apprendi* required a jury to find them. *Id.* at 609.

But the existence of an aggravating factor was not the only death-qualifying element of Arizona's superseded capital sentencing statute.  In *Ring II*, the Supreme Court described several determinations that had to occur under Arizona law before a defendant became death-eligible,

---

[5] The question presented in *Ring II* was: "whether [the] aggravating factor may be found by the judge . . . or whether the Sixth Amendment's jury trial guarantee . . . requires that the aggravating factor determination be entrusted to the jury."  536 U.S. at 597.

including the judge's determination that "there are no mitigating circumstances sufficiently substantial to call for leniency." *Id.* at 593 (quoting Ariz. Rev. Stat. § 13-703(F) (2001)).[6] Arizona's sentencing scheme required a judge "to determine if there are any mitigating circumstances" and "weigh them against the aggravators and decide by 'special verdict' whether a death sentence is appropriate." *State v. Ring (Ring I)*, 25 P.3d 1139, 1151 (Ariz. 2001) (citations omitted). The statute required "more than the presence of one or more statutorily defined aggravating factors to impose the death penalty." *Ring III*, 65 P.3d at 946. It also mandated that "a trier of fact . . . determine whether mitigating circumstances call[ed] for leniency." *Id.*

Under the superseded law, a defendant's eligibility for a death sentence was effectively contingent on the judge's findings regarding *both* aggravating and mitigating circumstances. The "ultimate element" qualifying the defendant for death was "at least one aggravating circumstance not outweighed by one or more mitigating factors." *Ring III*, 65 P.3d at 935 (citing Ariz. Rev. Stat. § 13-703(E)); *see also Ring II*, 536 U.S. at 593. A judge's determination that no mitigating circumstances existed therefore also served to establish a fact that qualified a defendant for the death sentence. Applying the rationale of *Apprendi* and *Ring II*, the existence or absence of a mitigating circumstance was thus a finding of fact upon which the "increase of a defendant's authorized punishment [was] contingent." *Ring II*, 536 U.S. at 602.

---

[6] Unless otherwise noted, subsequent citations to Arizona statutes refer to those statutes as they existed in 2001.

This reasoning makes sense given the nature of factfinding at the death-sentencing stage. A finding that certain facts establish an aggravating factor often necessarily implies that the same facts do not establish a mitigating factor. In this appeal, for instance, Murdaugh argues his dismemberment of Reynolds's body demonstrates his paranoia and delusions, and therefore helps establish a mitigating circumstance. The state argues, conversely, that the mutilation establishes that the murder was depraved. In finding that dismemberment supported the (F)(6) aggravating factor, then, the trial judge also implicitly found that this evidence did not establish any mitigating factors. The intertwined nature of the inquiry means that a factfinder's analysis of aggravating factors in isolation is conceptually untenable.

A jury's findings concerning aggravating factors are also necessarily intertwined with its findings about mitigating circumstances because of the process for hearing evidence at the sentencing stage. A jury does not hear the aggravating evidence in a void. Rather, a defendant presents mitigating evidence, following the state's presentation of aggravating evidence, in an attempt to establish some basis for leniency. *See* Ariz. Rev. State. §§ 13-752(E)–(G) (2012). It would be impossible for a jury to consider only the aggravating evidence in determining whether the aggravating factors were met without also implicitly considering contravening mitigating evidence. A jury that has listened to extensive mitigating evidence about the defendant's good character, for instance, may be much less likely to find the defendant acted heinously or cruelly in committing the offense. The right to

have a jury determine aggravating factors is therefore also a de facto right to have a jury determine mitigating facts.[7]

---

[7] In practical effect, *Ring II* created a right to have the jury determine all the facts on which a sentence of death depended, both aggravating and mitigating, since capital sentencing statutes assigned this function to one factfinder. *See Ring III*, 65 P.3d at 943. The capital sentencing statutes in all states with the death penalty, with the sole exception of Nebraska, now require juries to consider mitigating evidence, determine the existence or absence of mitigating circumstances, and decide whether death is the appropriate sentence. *See* Ala. Stat. § 13A-5-46(e); Ark. Code §§ 5-4-602 (3)–(5), 603(a); Ariz. Rev. Stat. § 13-752; Cal. Penal Code § 190.3; Colo. Rev. Stat. § 18-1.3-1201(2)(a); Del. Code tit. 11, § 4209(c)(3); Fla. Stat. § 921.141(2); Ga. Code §§ 17-10-30(b), 31(a); Idaho Code § 19-2515(3)(b); Ind. Code § 35-50-2-9(l); Kan. Stat. § 21-6617(e); Ky. Rev. Stat. § 532.025(1)(b), (3); La. Code Crim. Proc. art. 905.3; Md. Crim. Law § 2-303(i)(1); Miss. Code § 99-19-101(3); Mo. Rev. Stat. §§ 565.030.4, 565.032; Nev. Rev. Stat. § 175.554; N.H. Rev. Stat. § 630:5(IV); N.C. Gen. Stat. § 15A-2000(b); N.Y. Crim. Proc. § 400.27; Ohio Rev. Code § 2929.03(D)(2); Okla. Stat., tit. 21, § 701.11; Or. Rev. Stat. § 163.150; 42 Pa. Cons. Stat. § 9711; S.C. Code § 16-3-20; S.D. Codified Laws § 23A-27A-3; Tenn. Code § 39-13-204; Tex. Code Crim. Proc. art. 37.071; Utah Code § 76-3-207; Va. Code § 19.2-264.4; Wash. Rev. Code § 10.95.060; Wyo. Stat. § 6-2-102. Although Montana has not revised its capital sentencing scheme since *Ring II*, *see* Mont. Code 46-18-301, the state also has not sentenced any defendant to death since 1996. *See* Death Penalty Information Center, Death Sentences in the United States from 1977 By State and By Year, http://www.deathpenaltyinfo.org/death-sentences-united-states-1977-2008 (last visited April 18, 2013).

The jury plays a similar role in the federal capital sentencing statute. *See* 18 U.S.C. § 3594. Even in those states where the ultimate jury recommendation of death remains nonbinding, the jury retains the role of first factfinder. *See* Ala. Stat. § 13A-5-46(e); Del. Code tit. 11, § 4209(c)(3); Fla. Stat. § 921.141(2); Ga. Code §§ 17-10-30(b), 31(a); Ky. Rev. Stat. § 532.025(1)(b), (3).

As the Supreme Court has stressed repeatedly, how a fact is labeled is irrelevant to the *Apprendi* analysis. *See Ring II*, 536 U.S. at 602; *Apprendi*, 530 U.S. at 494. It is the effect of a fact that dictates whether a jury must determine it. *Apprendi*, 530 U.S. at 494; *see also Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013) (reiterating that any fact that has the effect of increasing the penalty for a crime must be submitted to the jury). Because the existence or absence of mitigating circumstances directly affected whether Murdaugh was death eligible under Arizona law, he had a right to have a jury decide those facts.[8]

## B) Standard of Review

We next address Murdaugh's argument that, contrary to the holding of the Arizona Supreme Court, *Ring* error is structural and should not be subject to harmless error review.

In *Ring II*, the Supreme Court did not reach the question of whether the *Ring* error there was harmless, noting that "this Court ordinarily leaves it to lower courts to pass on the harmlessness of error in the first instance." 536 U.S. at 609 n.7 (citing *Neder v. United States*, 527 U.S. 1, 25 (1999)). The Court reiterated that it had left open the question of whether the error in *Ring II* was harmless in *Mitchell v.*

---

[8] A narrow reading of *Ring II* is particularly problematic for an appellate court reviewing a *Ring* error for harmlessness. In many cases, the question of whether the judge's role in finding aggravating factors prejudiced the verdict will depend on the extant mitigating circumstances. Consider a judge who found two aggravating factors when a jury would have found only one. If there are no mitigating circumstances to counterbalance the unblemished aggravator, the error is inconsequential— but if there are substantial mitigating circumstances, the error might make all the difference. *See State v. Lehr*, 67 P.3d 703, 705 (Ariz. 2003).

*Esparza*, 540 U.S. 12, 17 (2003). The Court emphasized that where it has not set forth a standard of review for a constitutional error and the Court's precedent "is, at best, ambiguous," a federal court may not overrule a state court's decision to apply harmless error review. *Id.*

In *Ring III*, the Arizona Supreme Court definitively answered this question, applying the harmless error standard set forth in *Neder*. 65 P.3d at 935–36. As part of this review, the court asked whether it could conclude, "beyond a reasonable doubt, that no rational trier of fact would determine that the mitigating circumstances were sufficiently substantial to call for leniency." *Id.* at 946. If, in future *Ring* error cases, the court could not answer this question in the affirmative, it would remand the case for resentencing by a jury. *Id*. The state challenged the Arizona Supreme Court's application of the harmless error test, arguing that this application of harmless error review, which included review of the mitigating factors for harmless error, was beyond the scope of the constitutional error articulated in *Ring II*. *See Nordstrom*, 77 P.3d at 46 n.5. The Arizona Supreme Court rejected this argument, and the Supreme Court denied certiorari. *See Pandeli*, 540 U.S. 962 (2003). Thus, it is now well-settled that *Ring* error is subject to the harmless error test articulated in *Ring III*, and we may not reconsider the issue here.

### C) Harmless Error Review

Harmless error analysis requires federal courts to determine "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). We "apply the

*Brecht* test without regard for the state court's harmlessness determination." *Pulido v. Chrones*, 629 F.3d 1007, 1012 (9th Cir. 2010) (citing *Fry v. Pliler*, 551 U.S. 112, 121–22 (2007)). The *Brecht* standard has been described as follows:

> [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence.

*Merolillo v. Yates*, 663 F.3d 444, 454 (9th Cir. 2011) (quoting *Kotteakos*, 328 U.S. at 765). "Where the record is so evenly balanced that a judge 'feels himself in virtual equipoise as to the harmlessness of the error' and has 'grave doubt about whether an error affected a jury [substantially and injuriously], the judge must treat the error as if it did so.'" *Id.* (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435, 437–38 (1995)) (alteration in original) (internal quotations omitted). Of course, here, the underlying error is the absence of a jury itself. Accordingly, the *Brecht* inquiry is whether the absence of a jury as factfinder at the penalty stage "substantially and injuriously" affected or influenced the outcome. In other words, we ask whether a rational jury could have found that the facts called for leniency. In order to determine whether Murdaugh has met the *Brecht* standard, we review the aggravating and mitigating factors.

### a)  Aggravating factors

The Arizona Supreme Court held that the (F)(1) aggravating factor fell outside the *Ring* rule and concluded that the government had proven the (F)(6) aggravating factor beyond a reasonable doubt.[9]  Murdaugh does not challenge the court's determination as to the (F)(1) aggravating factor. With respect to the (F)(6) factor, he argues that the Arizona Supreme Court's conclusion that any rational jury would have found the aggravating factor "hinged upon Murdaugh's mutilation of the body after the crime," which the court further found "needed to be motivated by debasement." Since he mutilated the body to avoid detection, Murdaugh contends a rational jury might not have found the F(6) factor.

But the court did not "hinge" its determination that the state had proven the (F)(6) factor on Murdaugh's mutilation of the body alone. *Murdaugh*, 97 P.3d at 856.  The court correctly noted that the (F)(6) aggravating factor would have been established if the state had proven only one of the heinous, cruel, or depraved elements. *Id.*  And, although the court concluded that "mutilation by itself will establish the elements of heinousness or depravity," *id.* at 858, the court nonetheless found that three other factors also supported a finding that the act was "heinous or depraved."  According to the court, the state established beyond a reasonable doubt that

---

[9] Recall that the (F)(1) aggravating factor is established when a defendant "has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable." Ariz. Rev. Stat. § 13-703.  The (F)(6) aggravating factor is established if the murder was committed in an "especially cruel, heinous or depraved manner." *Id.*

(1) Murdaugh relished the murder, (2) the murder was senseless, and (3) the victim was helpless. *Id.* at 856.

Murdaugh is also incorrect in asserting that the Arizona Supreme Court found the mutilation "needed to be motivated by debasement." To the contrary, the court described how Murdaugh mutilated the body to prevent identification and cited *State v. James*, 685 P.2d 1293, 1299 (Ariz. 1984), for the proposition that "[t]he mode of disposing of the body itself demonstrates a certain callousness and depravity and disregard for the victim's family who might never have learned of the fate of [the victim]." *Id.* at 857. Thus, regardless of Murdaugh's ultimate purpose in mutilating the body, the court concluded the mutilation demonstrated depravity for purposes of finding the (F)(6) factor. *Id.*

Although Murdaugh is correct that "heinous and depraved" refers to the mental state of the defendant, it is the defendant's "words and actions" which demonstrate this mental state. *See State v. Gretzler*, 659 P.2d 1, 10 (Ariz. 1983) (en banc). The Arizona Supreme Court has repeatedly held that needlessly mutilating a body is the kind of action that shows depravity, regardless of the mutilator's purpose. *See State v. Spencer*, 859 P.2d 146, 154 (Ariz. 1993); *James*, 685 P.2d at 1299. We conclude that no rational jury could have found that the evidence failed to establish the (F)(6) factor.

### b) Mitigating factors

Murdaugh next argues that a rational jury could have found that his evidence established the (G)(1) mitigating factor and consequently imposed a sentence of life, not death. We agree. For the reasons discussed below, we hold that the

*Ring* error had a "substantial and injurious effect or influence" on the trial court's failure to find the (G)(1) mitigating factor and thus the trial court's imposition of a death sentence.

The (G)(1) factor exists if the "defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired but not so impaired as to constitute a defense to prosecution." Ariz. Rev. Stat. § 13-703(G)(1). Drug impairment can be a mitigating circumstance under the (G)(1) factor, but only if the defendant can show a connection between the drug use and the offense. *See State v. Sansing*, 77 P.3d 30, 37 (Ariz. 2003). Typically, testimony by an expert witness can establish this causal nexus. *Id.* The claim of drug impairment is undermined, though, if the evidence shows "the defendant took steps to avoid prosecution shortly after the murder, or when it appears that intoxication did not overwhelm the defendant's ability to control his physical behavior." *Id.* (quoting *State v. Rienhardt*, 951 P.2d 454, 466–67 (Ariz. 1997) (en banc)).

Even though Murdaugh did not present a mitigation case, the trial court considered the Rule 11 competency reports and Dr. Lang's testimony in determining whether the (G)(1) mitigating factor was established. This evidence included Dr. Potts's conclusion that "[t]he use of methamphetamine quite likely greatly contributed to the alleged offenses having occurred," as well as Dr. Sindelar's summary of Murdaugh's "long history of multiple substance abuse, including intravenous injection of methamphetamine." Based on this record, the trial court found that Murdaugh (1) evinced paranoid thoughts, including his paranoid belief that the CIA had placed a tracking device in his head; (2) had a long

history of chronic drug abuse, which may have been a cause of his paranoid delusions; (3) was ingesting drugs and was under the influence of drugs when he murdered Reynolds; and (4) possibly suffered from a personality disorder amplified by methamphetamine abuse. In considering the totality of the circumstances, the trial court also found that Murdaugh arranged for Reynolds to be lured to his home, imprisoned him for an extended period of time, elaborately dismembered his body, and then was able to find medical care for himself when he injured his leg. The trial court concluded that "[t]he industry and thought, manifested over an extended period of time, which went into the murder of David Reynolds belies a finding that the Defendant was significantly impaired." On this basis, the trial court held that the record did not establish by a preponderance of the evidence that Murdaugh's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, and thus that the evidence did not establish the (G)(1) mitigating factor.

While it is certainly possible that a reasonable jury could have agreed with the trial judge and found that the facts surrounding the murder undermined the evidence of drug impairment in the Rule 11 reports, it is also entirely possible that a rational trier of fact could have drawn the opposite conclusion and found Murdaugh's actions did not evince a sober mind. *See, e.g.*, *Nordstrom*, 77 P.3d at 46. This is particularly true in light of the low burden of proof for finding a statutory mitigating factor: a nonunanimous jury need only find the mitigating factor supported by a preponderance of the evidence. *See* Ariz. Rev. Stat. § 13-703(C). For instance, a reasonable jury might not have found that Murdaugh's actions to cover up the murder

demonstrated any kind of sober sophistication. Instead of cleaning up the crime scene, Murdaugh asked Rohrs and Gross to sprinkle horse manure over Reynolds's body and on the surrounding blood, and then left the body there for the remainder of the day. It was not until that evening—probably at least eight to ten hours after the crime—that Murdaugh dismembered the body. Thus, a reasonable jury might not have found Murdaugh's attempt to thwart identification of the body to be inconsistent with a finding that Murdaugh was "significantly, but only partially, impaired" at the time of the offense. *Gretzler*, 659 P.2d at 17. That a rational jury might have found that the evidence established the (G)(1) mitigating factor is sufficient to establish prejudice under *Brecht*.

The Arizona Supreme Court's determination that any error was harmless casts no doubt on our conclusion, because that court clearly failed to consider evidence in the record—evidence that the trial court did consider in determining whether the (G)(1) mitigating factor was established. In reviewing the trial court's finding on the (G)(1) factor for harmless error, the Arizona Supreme Court stated that it considered the reasoning of the trial court, the testimony of Dr. Lang and "uncontroverted evidence in the record . . . that Murdaugh took steps to avoid detection." *Murdaugh*, 97 P.3d at 860. The court found that because Murdaugh did not present any mitigation, he did not present "*any expert testimony* to establish that his ability to control his behavior or appreciate the wrongfulness of his conduct was significantly impaired." *Id.* (emphasis added). Thus, "[b]ecause of the *complete lack* of evidence of a causal connection between Murdaugh's drug use and the murder," the court concluded "beyond a reasonable doubt that no rational jury would have found that Murdaugh established the

(G)(1) mitigating circumstance." *Id.* at 860 (emphasis added).

Murdaugh correctly argues that the Arizona Supreme Court failed to consider the Rule 11 competency reports, which included expert testimony establishing a direct causal link between Murdaugh's drug use and the murder. Under then-existing Arizona case law, the Rule 11 reports were the kind of evidence that could have established drug impairment for purposes of the (G)(1) factor. *See Gretzler*, 659 P.2d at 16–17 (concluding the evidence supported trial judge's finding of the (G)(1) factor when the defendant "used drugs continuously for a period of over nine years" and "medical testimony [showed] that this continuous use of drugs likely impaired defendant's volitional capabilities"). Moreover, in applying harmless error analysis in other *Ring* error cases, the Arizona Supreme Court has found reversible error as to the (G)(1) factor based solely on the contradicted testimony of one expert. *See Pandeli*, 65 P.3d at 953; *see also Nordstrom*, 77 P.3d at 46 (finding *Ring* error where defendant presented evidence from one expert on the possible connection between defendant's alcohol and substance abuse and the murders even though the evidence "was not particularly compelling"). Thus, under the Arizona Supreme Court's own cases, we cannot see how the Arizona Supreme Court could have reasonably concluded that *no* rational jury could find the evidence here supported drug impairment by a preponderance of the evidence. Had the Arizona Supreme Court considered *all* the evidence in conducting its harmless error review, it would have been impossible to conclude that *no* rational jury could have found the (G)(1) factor.

We conclude that the absence of a jury at the sentencing stage had a "substantial and injurious effect or influence" on

Murdaugh's sentence of death. *Brecht*, 507 U.S. at 637 (internal quotation marks and citations omitted). Although a jury would have found the (F)(6) aggravating factor beyond a reasonable doubt, some evidence supported the (G)(1) mitigating factor. The expert reports, though not drafted for the purpose of mitigation, provided some details about Murdaugh's chronic drug use, which a jury might have found established drug impairment. Because a jury could have found that a preponderance of the evidence supported the (G)(1) mitigating factor, and voted for leniency on that basis, the *Ring* error was prejudicial. We must grant the habeas petition.[10]

## 2.  Unconstitutional Nexus Test Claim

Murdaugh next argues that, in reviewing his sentence for harmless error, the Arizona Supreme Court applied an unconstitutional causal nexus test to mitigating evidence of his drug use and delusions.

Because the state post-conviction court did not address this claim, we review de novo whether the Arizona Supreme Court applied an unconstitutional test. In his petition for post-conviction relief, Murdaugh argued that both the sentencing court and the Arizona Supreme Court applied an unconstitutional nexus test. The state post-conviction court did consider and reject Murdaugh's claim with respect to the sentencing court, a decision Murdaugh does not appeal. The state post-conviction court said nothing, however, regarding

---

[10] Though not part of our prejudice analysis here, we note that of the nineteen *Ring* cases remanded for resentencing by a jury, eleven have resulted in a sentence other than death. *See* Justin F. Marceau, *Arizona's Ring Cycle*, 44 Ariz. St. L.J. 1061, 1077 (2012).

Murdaugh's claim about the Arizona Supreme Court. Given that this claim had arguable merit, and in light of the state post-conviction court's otherwise careful consideration and evaluation of every other claim in Murdaugh's petition, "the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court," thus permitting de novo review. *Johnson v. Williams*, 133 S. Ct. 1088, 1097 (2013).

A state court violates a capital defendant's Eighth and Fourteenth Amendment rights to an individualized sentencing when it excludes or refuses to consider in mitigation evidence that lacks a causal nexus to the crime. *See Smith v. Texas*, 543 U.S. 37, 45 (2004) (per curiam); *Tennard v. Dretke*, 542 U.S. 274, 282–88 (2004). A court may, however, consider the failure to establish a causal connection between the mitigating factors and the crime "in assessing the quality and strength of the mitigation evidence." *Towery v. Ryan*, 673 F.3d 933, 945 (9th Cir. 2012) (quoting *Schad v. Ryan*, 671 F.3d 708, 723 (9th Cir. 2011) (per curiam)).

Murdaugh argues that an unlawful nexus test was manifest in the Arizona Supreme Court's explanation of why a rational jury would not have weighed the nonstatutory mitigating circumstances differently than the sentencing court did:

> The trial court first found that the evidence proffered in support of the (G)(1) mitigating circumstance also supported a finding of [eight] non-statutory mitigating circumstances . . . . The reports prepared by Drs. Sindelar, Potts, and Scialli do reveal that Murdaugh experienced certain paranoid thoughts and

delusions that were likely exacerbated by his
history of chronic methamphetamine use. But
because no mental health professional found
a causal nexus between these conditions and
the murders, we find beyond a reasonable
doubt that no rational jury would have
weighed these factors any differently than did
the trial judge.

*Murdaugh*, 97 P.3d at 860 (citations omitted).

The court's discussion makes clear that it did not refuse
to consider evidence that was not causally connected to the
crime. *See Eddings v. Oklahoma*, 455 U.S. 104, 113–14
(1982). After observing that the sentencing court found
eight nonstatutory mitigating circumstances—including
impairment from chronic and concurrent drug abuse, a
personality disorder, and paranoid thoughts—the court
explained that its task was to "determine whether a jury could
have weighed these mitigating factors differently than did the
trial judge," who "did not give [them] much weight."
*Murdaugh*, 97 P.3d at 860. The Arizona Supreme Court took
no issue with the trial court's finding that the Sindelar, Potts,
and Scialli reports did in fact establish various nonstatutory
mitigating circumstances.[11] Rather, the court took the fact
that no expert had drawn a causal link between those
circumstances and Murdaugh's crime as compelling evidence

---

[11] As we discussed in our analysis of Murdaugh's *Ring* claim, *supra*
Section III(1)(C)(b), the court did neglect to consider relevant expert
evidence in its discussion of the (G)(1) statutory mitigating factor. But
nothing in the court's opinion suggests that omission was the result of
applying a nexus test.

that a rational jury would have afforded them little weight, as the trial court did.

Because the court only raised the issue of a causal nexus to "determine the weight" that a hypothetical jury would have "given relevant mitigating evidence," the Court did not violate Murdaugh's constitutional rights. *Eddings*, 455 U.S. at 115.

### 3.  Conflict of Interest Claim

Murdaugh argues that the prosecutor's presentation of mitigation evidence at the behest of the trial court violated his Sixth and Fourteenth Amendment right to conflict-free representation.  Murdaugh argues that the prosecutor acted simultaneously as counsel for the prosecution and the defense when he presented a mitigation case on Murdaugh's behalf.

### A)  Procedural Default

Murdaugh did not raise this claim in his direct appeal to the Arizona Supreme Court.  The post-conviction review court subsequently held that the claim was precluded under Arizona Rule of Criminal Procedure 32.2(a)(3), which forecloses post-conviction relief on claims that are waived "at trial, on appeal, or in any previous collateral proceeding."

Murdaugh's claim is not procedurally defaulted because he did not violate a state procedural rule.  Arizona courts treat conflict of interest claims as a species of ineffective assistance of counsel claims.  *See, e.g.*, *State v. Jenkins*, 715 P.2d 716, 718–19 (Ariz. 1986) (en banc).  And Arizona law only permits defendants to bring ineffective assistance of counsel claims in Rule 32 post-conviction review

proceedings. *See, e.g.*, *State ex rel. Thomas v. Rayes*, 153 P.3d 1040, 1044 (Ariz. 2007) (en banc). Hence, Murdaugh's failure to raise this claim on direct appeal does not bar federal review. *See Lee v. Kemna*, 534 U.S. 362, 376 (2002).

## B) Analysis

A defendant's Sixth Amendment right to effective assistance of counsel "includes the entitlement to representation that is free from conflicts of interest." *United States v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005). To establish a violation of this right, a defendant "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980)).

Murdaugh cannot show that *his* counsel had a conflict of interest. Murdaugh's attorney did not present any evidence in mitigation, because Murdaugh did not let him. The prosecutor was not transmuted into defense counsel when, at the trial judge's request, he presented a mitigation case on Murdaugh's behalf, any more than a prosecutor becomes a defense attorney when he undertakes other acts favorable to the defendant's interests, such as disclosing material evidence or advocating a downward sentencing departure.

Arizona law does not require the prosecution to confine its presentation to matters inimical to the defendant: "At the penalty phase of the sentencing proceeding . . . the prosecution or the defendant may present any information that is relevant to any of the mitigating circumstances included in subsection G of this section . . . ." Ariz. Rev. Stat. 13-703(C). In presenting a case in mitigation, then,

Murdaugh's prosecutor was not even acting outside his remit—much less acting as *de jure* defense counsel.

Because the prosecutor never represented Murdaugh, the prosecutor's presentation of the mitigation case did not violate Murduagh's right to conflict-free representation. Murdaugh's derivative claims that his trial and appellate counsel were ineffective for failing to raise the conflict of interest claim are equally meritless. *See Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985).

## 4.  Claims Concerning Murdaugh's Guilty Pleas

Murdaugh contends that his guilty pleas were not knowing, intelligent, and voluntary because (1) counsel was ineffective in representing Murdaugh leading up to and during his guilty plea, and (2) the *Ring II* decision undermined the voluntariness of Murdaugh's guilty pleas. Neither of these claims has merit.

First, the record does not support Murdaugh's contention that counsel was deficient.  Murdaugh argues counsel was ineffective because (1) counsel failed to provide "background information" to the evaluating doctors in preparation for the Rule 11 evaluation; (2) he had "excessively limited access" to his counsel; (3) trial counsel failed to explain the advantages, disadvantages, and potential consequences of the plea agreement and instead sent the fact investigator to discuss the terms of the plea with Murdaugh; and (4) counsel promised Murdaugh an x-ray to prove there was no tracking chip in Murdaugh's head in order to convince Murdaugh to plead guilty.  The record does not show, however, that any deficiencies in counsel's performance were "so serious that counsel was not functioning as the 'counsel' guaranteed the

defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Second, the Arizona Supreme Court did not unreasonably apply the law or the facts in denying Murdaugh's claim that the *Ring II* decision undermined the voluntariness of his guilty pleas. Nothing in the record indicates that Murdaugh's decision to plead guilty was influenced by whether a judge or a jury would decide his sentence. And while it is true that the Supreme Court held that the "new rule" of *Ring* applied to criminal cases still pending on direct review, *see Schriro v. Summerlin*, 542 U.S. 348, 351 (2004), the mere fact that a new rule may affect a defendant's trial rights does not necessarily undermine the voluntariness of the defendant's plea, *see Brady v. United States*, 397 U.S. 742, 756–57 (1970). Accordingly, the Arizona Supreme Court's denial of Murdaugh's claim was not unreasonable.

## 5. Competence Claims

Murdaugh also raises various claims concerning his competence to waive the presentation of mitigating evidence. Specifically, Murdaugh contends that he was incompetent to waive mitigation, that the trial court made an inadequate determination of his competence to waive mitigation, that trial counsel erred in handling the mitigation waiver, and that appellate counsel failed to raise all of the claims related to this issue on direct appeal. Having granted relief on Claim 1, we reserve any decision on these competence issues.

### IV. Conclusion

Because we reverse the denial of relief on Murdaugh's *Ring* claim, we need not reach the claims concerning

Murdaugh's competence to waive the presentation of mitigating evidence. We otherwise affirm the district court and remand with instructions to grant the petition unless the state conducts a new sentencing hearing within a reasonable period of time. *Cf. Jennings v. Woodford*, 290 F.3d 1006, 1020 (9th Cir. 2002).

**REVERSED in part, AFFIRMED in part, and REMANDED.**